THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PHILIP Fox *et al.* Plaintiffs in Error.

*Opinion filed December 16, 1925—Rehearing denied Feb. 5, 1926.*

1. CRIMINAL LAW—*admissibility of confession is a question for the court—review.* Where the circumstances under which a confession was made show that it was voluntary or where no objection is made to its admission it is not error to receive the confession in evidence without further preliminary proof, but where objection is made that the confession was involuntary there must be a hearing out of the presence of the jury, and the real question presented to the court is not whether there is evidence of threats or promises, but whether there has been any threat or promise of such a nature that a prisoner would be likely to tell an untruth from fear of the threat or hope of profit from the promise; and the decision of the court will not be disturbed unless it is manifestly against the weight of the evidence.

2. SAME—*ruling on question of evidence is not final until judgment is entered—res judicata.* The ruling of the court on the admissibility of evidence is not final until there has been a final judgment entered in the case, and the court may change its ruling on such questions at any time during the progress of the trial or on a second trial held after disagreement of the jury, and hence a ruling excluding confessions on the first trial of a criminal case is not *res judicata* on a second trial.

3. SAME—*involuntary confessions are excluded because unworthy of belief.* Involuntary confessions are rejected not because of the illegal or deceitful methods employed in securing them nor because of the privilege against self-incrimination, but they are excluded because they are not likely to be true and there is no test of their truthfulness.

4. SAME—*privilege against self-incrimination does not apply to confessions.* The constitutional provision that "no person shall be compelled in any criminal case to give evidence against himself" does not include statements or confessions by one suspected of or charged with a crime when the confession is not made in the course of a judicial proceeding.

5. SAME—*when a confession is voluntary.* A confession is regarded as voluntary when it is made of the free will and accord of the accused, without fear or any threat of harm or without promise or inducement by hope of reward; but it need not be spon-

taneous, nor is it necessary that it proceed wholly at the suggestion of the accused, and it may be set in motion by external causes so long as such influences are not what the law deems improper.

6. SAME—*what does not render confession incompetent.* A confession is not rendered inadmissible by the mere fact that it was elicited by questions put by police officers or others or by the fact that an exhortation to tell the truth produced it; nor does the fact that the prisoner was not warned that the confession might be used against him render it incompetent.

7. SAME—*burden is on prosecution to prove confession voluntary.* The burden is on the prosecution to show, by other evidence than that of the party receiving the confession, that it was voluntarily made, but it need only show, with sufficient detail to enable the court to determine the question, the circumstances under which the confession was made, and having made such *prima facie* showing the burden of going forward with the proof properly shifts to the accused.

8. SAME—*competency of confession must not be submitted to jury.* While the jury may consider the circumstances under which a confession was made in order to determine the credit to be given to it, the question of the competency of the confession must not be submitted to the jury.

9. SAME—*when confession of co-defendant is admissible—separate trial.* The confession of a co-defendant, when shown to be competent, is admissible where the jury are properly instructed to disregard it as to the defendant not making the confession, and a motion of the latter for a separate trial comes too late after the jury are sworn.

DUNCAN, J., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM N. GEMMILL, Judge, presiding.

THOMAS D. NASH, (MICHAEL J. AHERN, and ELWYN E. LONG, of counsel,) for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and MERRILL F. WEHMHOFF, (EDWARD E. WILSON, CLARENCE E. NELSON, W. A. RITTENHOUSE, and WILLIAM McSWIGGIN, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

About one o'clock A. M. June 9, 1921, Thomas A. Skirven was shot and killed in front of a Yellow Cab Company station located on the west side of Kedzie avenue north of Twelfth street, in the city of Chicago. The shot that killed him, and other shots that struck the building and a taxi-cab standing in front of the building, were fired from a touring car proceeding north on Kedzie avenue. Plaintiffs in error, Philip Fox and Morris Steuben, employees of the Checker Taxi Company, and three other persons, Charles Goldstein, Jimmie Mogley and Max Podolsky, who were granted a separate trial, were indicted for the murder at the June term, 1921, of the criminal court. Plaintiffs in error were placed on trial at the April term, 1922, but there was no verdict because of the disagreement of the jury. At the June term, 1925, plaintiffs in error were tried a second time, and there was a verdict finding them guilty and fixing their punishment at imprisonment in the penitentiary for their natural lives. This writ of error is prosecuted to review the judgment entered on this verdict.

Each of plaintiffs in error confessed his participation in this murder. On the first trial their confessions were offered in evidence, but the trial judge held that they were incompetent because they were involuntary. Prior to the second trial each of plaintiffs in error filed a petition asking the court to suppress the confessions on the ground that the ruling on their admissibility in the first trial is *res judicata,* and on the further ground that the confessions were obtained in violation of the constitutional rights of the petitioners. The court denied the petitions, and its ruling is assigned as error.

Whether a confession shall be received in evidence is a question for the court to decide when it arises on the trial. Until the confession is offered in evidence there is nothing

for the court to consider. The ruling of the court on the admissibility of evidence is not final until there has been a final judgment entered in the case. The court may change its ruling on such questions at any time during the progress of the trial or on a second trial. To state the proposition that the ruling of the court on the admissibility of these confessions on the first trial is a final adjudication of the question, which precludes the court on a second trial from reconsidering it, is to answer it.

Nor is there any merit in the second contention. Involuntary confessions are rejected not because of the illegal or deceitful methods employed in securing them but because of their unreliability. The object of every legal investigation being to ascertain the truth, the underlying principle on which confession evidence is, under certain circumstances, rejected is its testimonial worthlessness. If the court could know in a given case that a confession was true, it is clear that the evidence thereof should not be rejected. The wrong done, however reprehensible, in inducing the accused to make a confession could never, rightly considered, require a rejection of the confession if the court could know as a fact that the confession was true. The difficulty, however, is in determining that the involuntary confession is trustworthy, so the courts have established the rule that involuntary confessions shall be excluded for the reason that there is no test of their truthfulness. The modern rule limiting the admissibility of confessions had its first clear expression in 1783 in *Warickshall's case,* 1 Leach's Cr. L. (4th ed.) 263, where it is said: "It is a mistaken notion that the evidence of confessions and facts which have been obtained from prisoners by promises or threats is to be rejected from a regard to public faith. No such rule ever prevailed. * * * Confessions are received in evidence or rejected as inadmissible under a consideration whether they are or are not entitled to credit. A free and voluntary confession is deserving of the highest credit, because it is

319—39

presumed to flow from the strongest sense of guilt, and therefore it is admitted as proof of the crime to which it refers.   But a confession forced from the mind by the flattery of hope or by the torture of fear comes in so questionable a shape when it is to be considered as evidence of guilt that no credit ought to be given to it, and therefore it is rejected."   In *Regina* v. *Mansfield,* 14 Cox's C. C. 639, it is said:   "It is not because the law is afraid of having truth elicited that these confessions are excluded, but because the law is jealous of not having the truth."   And in *Regina* v. *Doyle,* 12 Ont. 347:   "The reason the confession in such a case is not admissible is that in law it cannot be depended upon as true; for one in such a case may say, and is likely to say, that which is not the truth if he thinks it to his advantage to do so."   The rule is thus stated in *Commonwealth* v. *Morey,* 1 Gray, 461:   "The ground on which confessions made by a party accused, under promises of favor or threats of injury, are excluded as incompetent is, not because any wrong is done to the accused in using them, but because he may be induced, by the pressure of hope or fear, to admit facts unfavorable to him without regard to their truth, in order to obtain the promised relief or avoid the threatened danger, and therefore admissions so obtained have no just and legitimate tendency to prove the facts admitted."   In *People* v. *McMahon,* 15 N. Y. 384, the rule that involuntary confessions are excluded on the ground of their want of reliability is thus stated:   "The principle upon which this rule is based is obvious.   It is that we cannot safely judge of the relation between the motives and the declarations of the accused when to the natural agitation consequent upon being charged with crime is super-added the disturbance produced by hopes or fears artificially excited.   It is because it is in its nature unreliable, and not on account of any impropriety in the manner of obtaining it, that the evidence is excluded.   In this all the authorities agree.   Mr. Phillips, speaking on the subject, says: 'A confession so obtained

cannot be received on account of the uncertainty and doubt whether the prisoner might not have been induced from motives of fear or interest to make an untrue statement.' " In *State* v. *Carrick,* 16 Nev. 120, it is said that it is only when the wrongful acts exercise such an influence over the mind of the accused as to induce him to state things that are not true that the courts are authorized to exclude the confession. The law in its general application to this question, as well as others, is founded in reason and common sense. Its object is to ascertain the truth, and it is not its purpose to reject any reliable or competent means of obtaining it. Greenleaf says: "The object of all the care which is taken to exclude confessions which were not voluntary is to exclude testimony not probably true." Wigmore says: "The principle, then, upon which a confession may be excluded is, that it is, under certain conditions, *testimonially untrustworthy.*" When the authorities are analyzed there is practically no disagreement among them. (See *State* v. *Turner,* 82 Kan. 787, 109 Pac. 654; *Roesel* v. *State,* 62 N. J. L. 216, 41 Atl. 408; *State* v. *Willis,* 71 Conn. 293, 41 Atl. 820; *People* v. *Wolcott,* 51 Mich. 612, 17 N. W. 78; *State* v. *Novak,* 109 Iowa, 717, 79 N. W. 465.) This principle of testimonial untrustworthiness being the foundation of exclusion, it follows that the exclusion is not rested upon the privilege against self-crimination. (2 Wigmore on Evidence,—2d ed.—sec. 823; note, Reasons for Exclusion of Confessions, 18 L. R. A.—n. s.—772.) The constitutional provision that "no person shall be compelled in any criminal case to give evidence against himself" does not include statements or confessions by one suspected of or charged with a crime when the confession is not made in the course of a judicial proceeding. (*People* v. *Owen,* 154 Mich. 571, 118 N. W. 590.) That a confession is not rejected because of any connection with the privilege against self-crimination is shown by the fact that the aim of the confession rule is to exclude self-criminating statements which are *false,* while

the privilege rule excludes all statements coming within it, whether true or false.

On the trial there was no attempt to offer the confession of Fox. A consideration of the circumstances under which his confession was obtained is therefore wholly immaterial to any issue in this case. When the confession of Steuben was offered there was a hearing before the court out of the presence of the jury. Steuben testified that he was taken to the State's attorney's office just before noon, June 9, and for about two hours was interrogated by William Scott Stewart, an assistant State's attorney, and George F. Barrett and Ben Samuels, attorneys for the Yellow Cab Company; that he was not in any way mistreated during this time; that about 1:30 P. M. he was taken back to the detective bureau; that he was not questioned again until he was returned to the State's attorney's office, about 9:00 o'clock in the evening; that he was again interrogated by Barrett for about an hour and was told repeatedly that the answers he was giving regarding the shooting were not true; that about 10:30 P. M. he was taken into an unlighted room by officer Bernacchi; that the officer told him he had better tell the truth about the shooting; that he replied that he was telling the truth, and that the officer said, "You are a liar," and kicked him on the shins; that he remained in the room about half an hour, and that Bernacchi questioned him continuously and kicked and beat him because he did not answer as the officer wanted him to; that about 11:00 P. M. he was again taken before Barrett and questioned for an hour; that his replies were not satisfactory and he was taken back to the dark room; that Bernacchi was joined by officer Moss and one or two other officers; that they slapped him and pushed him from one to the other, telling him he had better tell the truth; that one of the officers struck him across the shoulders with a hose; that this treatment lasted about half an hour and then he was again taken to Barrett and again questioned for an hour and a half; that he did not make satisfac-

tory answers and was again taken to the dark room, where the officers continued to question and beat him for about an hour; that he was struck in the mouth and one of his teeth knocked out; that he was taken before Barrett about 3:00 A. M. for a fifth examination; that he was told by Barrett that Fox had confessed and that he might as well do the same; that he was taken down-stairs and shown a touring car which was parked in front of the criminal court building; that he denied knowing anything about the car and was taken back up-stairs and given another beating; that about 5:00 A. M. he was taken before Barrett for a sixth examination; that they brought Fox into the room where he was and that he saw that Fox had been badly beaten; that in order to free himself from further abuse he told Barrett and the others present what they wanted him to tell; that about 10:00 A. M. he was taken before the grand jury and there he repeated his confession; that about 11:00 A. M. he was taken before Judge David on a writ of *habeas corpus;* that the judge gave him the choice of remaining in the custody of the State's attorney and the police or of being committed to the custody of the sheriff; that he hesitated whether to go to jail or back to the State's attorney's office; that he finally chose to go to jail; that he remained there about two days and during that time was examined by two physicians. He did not tell the grand jurors nor Judge David that he had been beaten and kicked by the police in the State's attorney's office nor did they ask him about his physical condition.

Dr. David B. Omens and Dr. William M. Martusson testified that they were employed by the Checker Taxi Company to examine the plaintiffs in error after they were confined in the county jail; that they examined Steuben and found bruises on his shins, a bruised spot on one of his shoulders, a long discoloration along the edge of the ribs and a loose upper incisor. The bruise on his shoulder is

described as one the size of the palm of the hand. There were no visible marks on Steuben's face.

Barrett testified that he began an investigation of the murder as soon as he learned of it; that he held many conferences at the State's attorney's office with Stewart; that he assisted Stewart in the interrogation of a large number of persons brought to the State's attorney's office by the police; that Steuben was in the custody of police officers in the criminal court building during the day but was not questioned prior to midnight; that between midnight and five o'clock in the morning he talked to him for about twenty minutes at three different times; that during the first two examinations Steuben denied any knowledge of the crime and replied to many of the questions that he did not know what they were talking about; that at no time while Steuben was in his presence was he subjected to mistreatment, nor was any promise made to him in consideration of his confessing the crime, nor did Steuben at any time show any evidence of having been subjected to abuse while out of his presence; that during the third examination, which occurred about five o'clock in the morning, Steuben stated that during the evening of June 8 a Yellow Cab chauffeur broke one of the windows in the Checker taxi-cab which Steuben was driving; that he got four other Checker Taxi chauffeurs and they secured a Winton touring car and drove west on Roosevelt road to Kedzie avenue; that their mission was to break Yellow taxi-cab windows in retaliation for the misdeeds of the Yellow Cab chauffeurs; that as they passed the Yellow Cab station on Kedzie avenue four or more shots were fired from the Winton touring car which he was driving; that they drove to the West Side garage of the Checker Taxi Company, where they left the Winton car; that they got a Hudson touring car and drove to Milwaukee avenue, where some shots were fired at the Yellow Cab station located there; that they drove from there to Brown's restaurant, where four of the men left the car and

went into the restaurant for a few minutes; that the men returned to the car and then drove to the West Side garage of the Checker Taxi Company, where they left the car; that he bought a newspaper on his way home that morning and for the first time learned that a man had been killed at the Kedzie avenue Yellow Cab station.

The stenographer who took the statement, and all of the police officers who had Steuben in custody or had any contact with him during the time he was under arrest in the State's attorney's office, testified that he was not subjected to any physical violence by any of them or in their presence and that no threats or promises were made to him. The officers who were charged by Steuben with striking and kicking him specifically denied the charges.

Confessions are competent evidence only when they are voluntarily made. (*People* v. *Sweeney,* 304 Ill. 502; *Robinson* v. *People,* 159 id. 115; *Green* v. *State,* 168 Ala. 90, 53 So. 286.) Generally speaking, a confession is regarded as voluntary when it is made of the free will and accord of the accused, without fear or any threat of harm or without promise or inducement by hope of reward. It need not be spontaneous, nor is it necessary that it proceed wholly at the suggestion of the accused. It may be set in motion by external causes so long as such influences are not what the law deems improper. A confession is not rendered inadmissible by the mere fact that it was elicited by questions put by police officers or others, or by the fact that an exhortation to tell the truth produced it. (*People* v. *Vinci,* 295 Ill. 419.) Nor does the fact that the prisoner was not warned that the confession might be used against him render it incompetent. (*Wilson* v. *United States,* 162 U. S. 613, 16 Sup. Ct. 895; *Coil* v. *State,* 62 Neb. 15, 86 N. W. 925; *Greenwood* v. *State,* 107 Ark. 568, 156 S. W. 427.) Whether the confession is voluntary is a preliminary question which must be decided by the court from evidence

heard out of the presence of the jury. In considering the question the court weighs the evidence submitted as it does in the consideration of any other question submitted to it for decision. The real question presented to the court is not whether there is evidence of threats or promises, but whether there has been any threat or promise of such a nature that a prisoner would be likely to tell an untruth from fear of the threat or hope of profit from the promise. (*Regina* v. *Reason,* 12 Cox's C. C. 228; *Bartley* v. *People,* 156 Ill. 234; *State* v. *Vey,* 21 S. D. 612, 114 N. W. 719.) The rule requiring a showing that a confession is voluntary before it is competent evidence "was not established to protect the guilty against his truthful confession, but is designed to guard the innocent against a false confession made under duress, promise of reward of some nature, or other inducement." (*State* v. *Stevens,* 60 Mont. 390, 199 Pac. 256.) The original English rule, which is the one accepted in most American jurisdictions, is that the prosecution offering the confession must show that it was made without any improper inducement from the person receiving the confession. (*Regina* v. *Warringham,* 2 Den. Cr. C. *447; *Watts* v. *State,* 99 Md. 30, 57 Atl. 542; *Godau* v. *State,* 179 Ala. 27, 60 So. 908; *Hathorn* v. *State,* (Miss.) 102 So. 771; *Richardson* v. *State,* 92 Tex. Crim. 526, 244 S. W. 1021; *State* v. *Martinez,* (N. M.) 230 Pac. 379; *People* v. *Soto,* 49 Cal. 67; *State* v. *Johnson,* 30 La. Ann. 881; 2 Bishop's New Crim. Proc. sec. 1220.) Where the circumstances under which the confession is made show that it is voluntary, or where no objection is made to its admission on the ground that it is involuntary, it is not error to receive the confession in evidence without further preliminary proof. (*Heningburg* v. *State,* 153 Ala. 13, 45 So. 246.) Where objection is made there must be a hearing on the question out of the presence of the jury, and the accused must be given full opportunity to cross-examine the witnesses who testify in support of the competency of the

confession and to produce evidence against its competency. (*People* v. *Sweeney, supra;* 2 Wharton on Crim. Evidence,—10th ed.—1295.) The order of proof is largely within the discretion of the trial judge. While the burden of showing that no improper inducement existed when the confession was made is upon the prosecution, it is not necessary for the prosecution to produce all its evidence before any evidence is produced on behalf of the accused. After the State has made a *prima facie* case, then the burden of going forward with the proof properly shifts to the accused. (*Sims* v. *State,* 59 Fla. 38, 52 So. 198.) After the accused has made his case the prosecution may produce evidence in rebuttal to meet that offered against the competency of the confession. In order to meet its burden of showing the confession to be voluntary, the prosecution must show by its witnesses the circumstances under which the confession was made, with sufficient detail to enable the court to determine the question. It is not sufficient that the one receiving the confession merely state his conclusion that the confession was voluntary. (*State* v. *Martinez, supra.*) The preliminary question of the admissibility of confessions stands upon much the same legal footing as that of dying declarations, expert testimony and book accounts. The burden is on the offerer to show, respectively, that the dying declaration was made *in extremis,* (*People* v. *Corder,* 306 Ill. 264,) that the witness is an expert in the subject about which he is asked to express an opinion, (*Mauvaisterre Drainage and Levee District* v. *Wabash Railway Co.* 299 Ill. 299,) and that the books were regularly made and are true. (*Kirby* v. *Watt,* 19 Ill. 393.) The decision of the court on the preliminary question will not be disturbed unless it is manifestly against the weight of the evidence. (*Bartley* v. *People, supra;* 2 Wharton on Crim. Evidence,—10th ed.—1302; *Hopt* v. *Utah,* 110 U. S. 574, 4 Sup. Ct. 202; *State* v. *Kerns,* (N. D.) 198 N. W. 698; *State* v. *Allison,* 24 S. D. 622, 124 N. W. 747; *State* v. *Spanos,* 66 Ore. 118, 134 Pac. 6;

*State* v. *Kwiatkowski,* 83 N. J. L. 650, 85 Atl. 209; *Fife* v. *Commonwealth,* 29 Pa. 429.) While the jury may consider the circumstances under which a confession was made in order to determine the credit to be given to it, (*People* v. *Gukouski,* 250 Ill. 231; *Zuckerman* v. *People,* 213 id. 114;) on elementary principles defining the functions of judge and jury the question of competency of the confession must not be submitted to the jury. (2 Wigmore on Evidence,—2d ed.—sec. 861; *Ellis* v. *State,* 65 Miss. 44, 3 So. 188.) On this subject the court in *Burton* v. *State,* 107 Ala. 108, 18 So. 285, said: "Whether voluntarily made or not we hold is a question of law to be determined by the court from the facts as a condition precedent to their admission. Having been declared competent and admissible they are before the jury for consideration. The jury have no authority to reject them as incompetent. But the jury are the sole judges of the truth and weight to be given confessions, as they are of any other fact. In weighing the confessions the jury must take into consideration all the circumstances surrounding them and under which they were made, including those under which the court declared, as a matter of law, they were voluntary. In weighing confessions the jury necessarily consider those facts upon which their admissibility, as having been voluntarily made, depends. While there is no power in the jury to reject the confessions as being incompetent, there is no power in the court to control the jury in the weight to be given to facts. The jury may, therefore, in the exercise of their authority and within their province, determine that the confessions are untrue, or not entitled to any weight, upon the ground that they were not voluntarily made. The court passes upon the facts merely for the purpose of determining their competency and admissibility. The jury pass upon the same facts, and in connection with other facts if there are other facts, in determining whether the confessions are true, and entitled to any,

and how much, weight. The court and jury each have a well-defined and separate province."

We have discussed the law of confessions at length because the trial court seemed to be uncertain how to proceed in the investigation of the preliminary question presented on the objection to the admissibility of the confession and also the province of the court and the jury. While the proceeding was not altogether regular, we are of the opinion that no harm has come to Steuben because of the manner in which the question was considered. There was so much argument between court and counsel during the consideration of this question that we have experienced considerable difficulty in determining just what questions are presented on the record. The attorney for plaintiffs in error talked a great deal about the propriety of the court considering a stenographic report of the extra-judicial examinations of plaintiffs in error, but at no place in the record did he make any attempt to lay a proper foundation for the admission in evidence of the notes showing the examination of Steuben. After deciding that the confession of Steuben was voluntary, the court by instructions re-submitted the question to the jury. This was improper, but no complaint is made of the action of the court, and plaintiffs in error are not in a position to complain, for the reason that the instructions given were among those offered in their behalf.

We have examined all of the testimony heard by the court out of the presence of the jury and agree with the conclusion reached by the court that nothing occurred at the time the confession was made which would warrant the conclusion that the confession is untrue. The charges made by Steuben are denied by all the persons that had any contact with him at the time of and prior to the making of the confession. Whether the bruises found upon his body by the two physicians hired by his employer to examine him were received after his arrest depends entirely upon his statements. If he was beaten as he says he was, it is strange

that he did not complain to the grand jury or to Judge David, before whom he was taken a few hours after his experience in the State's attorney's office, and it is remarkable that his physical condition was not such that it would have brought inquiry from these men. The subject of his testimony before the grand jury was his confession, and it is unreasonable to believe that he was subjected to the abuse he describes and yet did not by word or conduct reveal his physical condition to this body of men. This is not a case where an accused was singled out for questioning and subjected for many hours to a cross-fire of questions, but is a case where officers charged with the prosecution of crime worked all day and all night examining witnesses to ascertain who did and who did not have knowledge of a murder committed upon the streets of the city of Chicago. The confession was competent and properly admitted.

Plaintiff in error Fox complains that while his name was not mentioned in the confession of Steuben, yet the jury were bound to know from a consideration of the confession, in the light of other evidence in the record, that Steuben's confession included him. At the request of Fox the court gave to the jury four instructions stating in varying language that admissions or confessions made by Steuben were not binding on Fox, and that in the consideration of the evidence with respect to Fox they should wholly disregard such admissions or confessions. The rights of Fox were fully protected from the effect of Steuben's confession, and he has no just cause of complaint because of its admission.

After the jury was sworn, and again after Steuben's confession was admitted, Fox made a motion for a separate trial. The motion came too late. It is conceded by Fox's attorney that no motion for a separate trial was made before the jury was sworn to try the cause. If it had been made in time it would have been a matter of discretion with the trial court, and to have denied it under the circumstances

shown in this record would not have been an abuse of discretion. *State* v. *Castelli,* 92 Conn. 58, 101 Atl. 476.

The evidence on which Fox was convicted is entirely circumstantial. Excepting his confession the same is true of Steuben.

Plaintiffs in error finally contend that the evidence in the record does not warrant the verdict of guilty. The occurrence witnesses testified that the shot which killed Skirven was fired from a dark-colored touring car about one o'clock in the morning; that the car was moving slowly at the time the shots were fired and that it proceeded north at increased speed after the shooting. Chauncey Scandiff testified that shortly after one o'clock he was driving a Yellow taxi-cab south on Kedzie avenue toward Twelfth street; that at Arthington street a black touring car approached him at a rapid rate of speed; that the driver seemed to be preparing to turn at Arthington street and cut over toward him so that he thought there was going to be a collision; that both cars slowed down so that when the touring car passed him it was traveling about fifteen miles an hour and he was traveling about eight miles an hour; that he glanced into the touring car and saw Charles Goldstein, who is indicted with plaintiffs in error, sitting by the side of the driver; that he continued south on Kedzie avenue to the Yellow Cab station and found Skirven lying on the floor with a bullet wound in his chest.

Robert Stamm testified that before midnight, June 8, he saw Goldstein, Fox, Steuben, Mogley and Podolsky at the Paulina street Checker Taxi garage; that Goldstein, in the presence of Fox and Steuben, asked him to go with them to kill some Yellow Cab drivers; that he refused to go, but that all of the five persons named got into a Checker taxi-cab and drove away. He testified further that Fox saw him subsequent to the murder and asked him not to go to the court house and testify against him; that he told him he would do his best not to be there; that Fox asked him to

meet him the next day and he would get him a job with the Checker Taxi Company.

Clement C. Peter testified that he was employed as a Yellow Cab chauffeur on June 9; that he was at the station at Logan Square about 2:30 A. M.; that a car, which appeared to him to be a Hudson touring car, drove by the station slowly; that there were five men in the car and that they fired a number of shots at him as they went by; that one of the men in the back seat was plaintiff in error Steuben.

Peter Hanson testified that shortly after three o'clock of the same morning he noticed a dark touring car stop in front of Brown's restaurant, at 2003 West Division street; that five men stepped out of the car and walked into the restaurant and through a side door into a pool hall adjoining; that among these men were plaintiffs in error Fox and Steuben; that they remained in the pool room a few minutes and then returned to the automobile and drove away. He testified further that the conduct of the five men aroused his suspicion, and that after they had gone he went into the toilet in the pool hall to see if he could find anything there; that he found nothing, but later he made a further investigation and found three guns under a porch at the rear of the pool hall. These guns he later delivered to superintendent Katz, of the Yellow Cab Company.

David J. Brown, the proprietor of the restaurant, testified that three or four men came into the restaurant shortly after three o'clock A. M., June 9, and walked through the door that leads to the pool room; that there is a toilet in that room which is often used by the public; that the pool room is used as a Checker Taxi station until one o'clock A. M., when it is closed, and that after that time the restaurant is headquarters for Checker Taxi chauffeurs; that the men were in the pool room three or four minutes and then went out; that he did not recognize any of the men except plaintiff in error Fox; that he saw Hanson around the restaurant several different times that night.

Thomas J. Mangan, a police officer, testified that he arrested Fox at his home about nine o'clock that morning; that when he started down the street with him Fox said, "What is this for? That shooting over on Twelfth street?" that he asked him what he knew of the shooting, and he answered that he had read of it in the paper.

Peter F. Sienkiewicz, a police officer, testified that he arrested Steuben about nine o'clock in the morning of June 9; that he found him in bed; that he said to Steuben, "I suppose you know what I am after," and that Steuben replied, "In regard to that trouble up here at Kedzie and Twelfth?" and that he replied, "Yes; the captain is taking them all in."

Samuel Miller testified that he was on June 9, 1921, floorman and manager of the Paulina street Checker Taxi garage and that Steuben and Fox were drivers who worked out of that garage. He identified one of the guns found at the rear of Brown's pool hall as the property of Steuben and another one of them as the property of Fox. He testified that he saw Fox and Steuben after they were released on bail; that he saw Fox in the latter part of July, 1921, at the Paulina street garage; that he talked with him about the charge against him, and that Fox said there would be nothing to the trial; that he told Fox he did not think much of anybody who did a thing like that, and that Fox replied, "Well, there is no use saying anything; it is not going to bring him back to life." He saw Steuben two or three days later at the same place; that he asked him when he got out of jail, and that he replied that he got out the same time Fox did. In discussing the trial Miller asked him why he went out and shot up the town, and Steuben replied that he had been in an argument at the Sherman House with Yellow Cab drivers, and that one of them tossed a brick through the window of his cab and another gave him a black eye, and that he went out to get even with them.

On cross-examination Scandiff admitted that he did not reveal to anyone for more than a year after the murder that he had seen Goldstein in the black touring car fleeing from the scene of the shooting. He did not appear at the coroner's inquest nor before the grand jury, nor did he testify at the first trial. On cross-examination Miller admitted that he left the employ of the Checker Taxi Company in September, 1921, and that he had since been employed as an investigator by the Yellow Cab Company; that he was among those being questioned at the State's attorney's office June 9, 1921, and that he was in that office from three o'clock in the afternoon until seven o'clock the next morning; that he knew something about the murder at that time but that he told those in charge of the investigation that he did not; that he did not testify at the coroner's inquest nor before the grand jury; that the first time he revealed the information he had regarding the ownership of the guns and the conversations he had with Fox and Steuben was after he had had trouble with the Checker Taxi Company and left its employ; that thereafter he went to an officer of the Yellow Cab Company and gave him the information about the guns and the statements. Stamm stated on cross-examination that the first time he told the story about seeing the five persons indicted leave in an automobile, with the declaration that they were going to kill Yellow Cab drivers, was when Miller came to see him about the matter after the jury had failed to agree at the first trial. Sienkiewicz testified at the first trial but did not say anything at that time about Steuben remarking to him at the time of his arrest that he knew he was being arrested for the trouble at Kedzie avenue and Twelfth street. There are many things revealed on the cross-examination which seriously affect the credit to be given the testimony of most of the witnesses for the prosecution. If their testimony did not stand in the record wholly uncontradicted there might be some basis for the argument that their testimony is un-

worthy of credit. All these witnesses were cross-examined at length and the jury had before them all the discrediting facts. The jury had the opportunity to hear the witnesses and to observe their conduct on the witness stand. At the request of plaintiffs in error the court gave four instructions specifically calling to the attention of the jury the fact that they were to take into consideration, in considering the evidence of the witnesses, their demeanor while testifying, their interest in the result of the trial, the improbability of the truth of their statements, and all other circumstances that would in any way affect their credibility. Twenty-four instructions were given on behalf of plaintiffs in error, and practically all of them were cautionary. Inasmuch as the incriminating circumstances and statements stand in the record undisputed, we cannot say that the jury were not justified in giving the uncontradicted testimony of the witnesses for the State full credit. The evidence warranted the verdict.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE DUNCAN, dissenting:

With the great amount of work this court has to do and does do, it is almost impossible to avoid error occasionally, even as to the evidence in the case and what it proves. I feel very sure that the court is under a misapprehension as to what the evidence in this case really proves on the question whether or not force was used to compel the defendants to make the confessions attributed to them at the State's attorney's office on the afternoon and evening of June 9 and the early morning of June 10. I therefore feel it my duty to file a dissenting opinion, in which I shall consider just two questions which I consider very material and decisive. The questions are, first, Did the court err in the admission of the alleged confession of Steuben before attorney George F. Barrett against him? Second, did the court err in ad-

319—40

mitting such confession, or any portion thereof, against the defendant Fox?

The evidence on the question as to how the confession of Fox was obtained was heard before the court out of the presence of the jury and just after the jury had been empaneled and sworn and before the opening statements of counsel had been made to them. W. A. Rittenhouse, representing the People, stated at the close of that evidence that he had doubts as to the competency of Fox's confession made to Barrett, for the reason that it was shown that Fox thought when Barrett, a former judge of Cook county, was examining him that he was in the presence of the court in a judicial proceeding. The court arrived at the same conclusion, and stated that no evidence of what transpired between Barrett and Fox would be permitted to go to the jury as evidence. As soon as it was determined that the alleged confession of Fox would be excluded and that the court would not then hear the evidence and pass on the admission of Steuben's alleged confession until that question arose on the trial, counsel for Fox made his motion for a separate trial to avoid the possibility of Fox being prejudiced by the evidence of a confession by Steuben, which motion was overruled. The jury were then returned, and after the opening statements were made a number of witnesses were examined, including Barrett, who was examined as to occurrences leading up to the alleged confession of Steuben. The jury again retired, and the evidence as to the admissibility of Steuben's confession to Barrett was heard by the court, which was limited by the court to the sole question whether or not the confession was compelled or induced by threats, abuse and violence permitted by the attorneys representing the People, and by the police of Chicago who were operating with them, or by either of them. Rittenhouse, for the People, again positively stated to the court that they were not going to offer the confession of Fox that was made to Barrett, thereby conceding that his confession was inadmis-

sible because Fox was caused to believe he was testifying to a court making a judicial investigation. The examination then proceeded to determine the question whether or not Steuben's confession was induced by the use of threats and violence, the court holding that if the testimony on that question was conflicting it should be submitted to the jury as a question of fact, and that the court could not pass on the question "unless the evidence was so overwhelming" as to make it a question of law. The court had already held that the People were only required to make a *prima facie* case that no force or violence was used in obtaining Steuben's confession, and the State used only Barrett to make the *prima facie* case, and it appears quite clear from the evidence that Barrett had no opportunity to know whether Steuben was beaten by the police after each of several examinations by Barrett because he would not testify as they and Barrett wanted him to testify.

The undisputed evidence upon this inquiry shows that very early in the morning of June 9, just a few hours after the murder with which they were charged was committed, the defendants were arrested on suspicion, without warrant, and were a little later taken to the State's attorney's office in Chicago and were there subjected to repeated separate examinations by Barrett and others, and that at the conclusion of each examination in which they failed to confess Barrett would throw up his hands and with a gesticulation exclaim, with an apparent look of disappointment or disgust, "Take him out for a while." This continued with Fox until about three o'clock A. M. of June 10, when he made his confession, and until about five A. M. of the same day, when Steuben confessed. Repeatedly, after about the second examination, each defendant was taken through the corridor that led from the room in which Barrett was examining them and other witnesses to the library room and from thence into a room next to the toilet, which is described as a room 10 by 18 feet, and is designated in the record as the "dark

room," "Miss Heffernan's room," and as "the room next to the toilet." According to one of the State's witnesses, Stewart B. Moss, a police officer, when Barrett again wanted to examine one of the defendants, either Stewart (another attorney assisting in the examination) or Barrett would call for him, and he would then be taken back from the dark room by some one of the police officers and again further examined until the final examinations were made that elicited the confessions. This same police officer, Moss, who was the officer who took Fox back and forth from before Barrett to the dark room and from thence back to Barrett, states that he took Fox into the dark room first about nine P. M. of June 9, and that there was nobody at that time with him and Fox, and that he at first turned the light on and shortly after he got into the room he turned the light off; that it was dark on the outside, and that on each of four occasions when he came back to that room he left the lights out "so nobody would see us there,—so nobody would see him," and that he did not want anybody to know he (Fox) was there. According to the testimony of Steuben and Fox this dark room was the preparation room for their final examinations, which resulted in confessions to Barrett. It was in this room that Fox and Steuben were maltreated, threatened and beaten by the police and told to "come across and tell the truth," according to their testimony. After they had confessed and when the grand jury had convened, about nine A. M. of the same morning, the defendants were taken by the police before the grand jury and instructed to give testimony before that body.

Barrett's testimony, which was submitted as the State's *prima facie* case to show that Steuben was not maltreated or beaten at all in his presence, in no way contradicts the evidence of Steuben, as Steuben made no statement or claim that he was beaten or maltreated by the police before or in the presence of Barrett, but that all that was done was in the dark room, to which Barrett distinctly testifies he did

not go and did not know what was done there. In addition to Barrett's testimony as to the obtaining of the confessions recited in the decision of the court, it appears from his evidence that he examined Steuben three different times between one A. M. and five A. M. on June 10, and that he may have examined him as early as ten o'clock on the night of the 9th, and admits that he may have said to Steuben that he was lying and that his testimony was moonshine when he denied knowledge of the killing and asked him if he expected to get away with that; that he did not tell him he had the right to refuse to answer his questions, that he was not informed that what he should there state might be used against him as evidence, and that it was not a matter of concern to him whether or not Steuben knew his constitutional rights. He really corroborates in the main all of Steuben's evidence as to what occurred when Steuben was being examined by Barrett, who was a former judge of Cook county and had resigned about five months before such examinations.

Both Fox and Steuben testified that they were repeatedly returned to the dark room after their examinations and were there beaten, kicked and vilified, and threatened with further violence if they did not confess. One police officer whom Fox did not know, asked him if he knew Barrett, who was then just passing while they were in the corridor on a bench, and when Fox said he did not know him and had never seen him before, the officer stated to him that it was Judge Barrett, who was going to cross-examine him, and that he had better come clean. It appears also that when Fox would answer Barrett's questions he would frequently address him, "Your honor;" that Barrett talked to him awhile in the Jewish language, which Fox understood, and told him he had better come clean, because he would have to anyway; that Barrett continually told him he was a liar when he denied knowledge of the killing; and that during the fourth examination policeman Bernacchi or

policeman Davern slapped him in the face in the presence
of Barrett, and that Barrett said to the officer: "Cut it
out; none of that stuff; cut it out." Barrett at no time
contradicted Fox in these charges. Fox stated that Davern
and Bernacchi were two of the police officers that beat him
up in the dark room; that Bernacchi bent down with his
knees in Fox's stomach and said to him, "Come clean, you
little son-of-a-bitch, or I'll throw you out of the window,"
and kept him on the floor five minutes, and that Davern
kicked him on the shins, and that he was struck from be-
hind by someone else; that he was then taken before Bar-
rett, who began to examine him by asking him, "Do you
know anything about it now?" and that he answered that·
he did not, but said he would say anything Barrett wanted
him to say, and then made his statement to him about three
A. M. After testifying before the grand jury he went be-
fore Judge Wilson in the *habeas corpus* proceeding and ex-
hibited the wounds and bruises on his head and face and
was later sent to jail. He also relates the incident of a re-
porter handing him a comb, in the presence of Barrett, to
comb his hair, which had been very much disheveled by the
mistreatment of the officers in the dark room. He further
testifies that about five police officers, including Bernacchi
and Davern, came into and out of the dark room at the time
they "mussed" his hair; that at the time Bernacchi and
Davern entered the room he did not see their faces because
it was dark but recognized them by their voices, they hav-
ing spoken to him before they went in there; that he saw
at the State's attorney's office twenty or twenty-five police
officers between eleven o'clock on June 9 and two o'clock
on the morning of the 10th; that while he was in jail he
was examined by three doctors,—Drs. Omens and Martus-
son and one who he learned was the jail doctor,—and in
two or three days was transferred to hospital "A" and was
there for some time.

Steuben testified that they took him to the State's attorney's rooms about 11:30 and he was questioned there for about two hours by Barrett, William Scott Stewart and Ben Samuels and was then taken to the detective bureau and kept until about eight or nine o'clock that evening, where he was not questioned; that he was taken from there to the State's attorney's office, sat on a bench in the corridor for about fifteen minutes and was then taken before Barrett and again questioned about the killing, and not giving satisfactory answers was asked why he did not tell the truth and cut out the "moonshine;" that then he was taken to the library for about fifteen minutes and then taken to the dark room adjoining the toilet by Bernacchi, who questioned him and told him he was lying and that he would be better off if he told the truth, and on replying that he was, Bernacchi also beat him and kicked him and re-questioned him and beat him; that they continued to take him from Barrett's room to the dark room and from there to Barrett's room, where they continued to question him and to beat and maltreat him until three o'clock A. M., and then Barrett told him he already had the truth from Fox and that he might as well come clean. He still persisted in his denials until about five A. M.; that they then brought Fox in, and, seeing that he was beaten up and had a puffed lip and face, he told them what they wanted. He was also taken down on the street to the Winton car and there questioned by Barrett. Afer he had testified before the grand jury he was taken before Judge David on a writ of *habeas corpus,* and on being given his choice by Judge David of returning to the State's attorney's office or to jail he chose the latter place. His experience in the dark room was similar to that of Fox, and it was so dark in there he could not recognize faces and is not sure who of the four or five men in there, besides Bernacchi, beat and kicked him. He was not beaten or abused in the room where Barrett was, and Steuben did not tell them there what they were doing to him in the dark

room, because he thought they knew it. He did not tell the grand jurors that he was beaten up, and was told by an officer in the State's attorney's office he had better not do so. Barrett, when questioning him, would get disgusted because witness would not state what Barrett wanted him to state, and would say at the end of an examination, "Take him out." Steuben testified that he was also examined in jail by the city doctor and the two doctors who examined Fox and was later transferred to hospital "A."

Fox and Steuben were corroborated by Drs. Martusson and Omens as to the fact that they had been severely beaten and maltreated. Martusson is senior member of the staff at Jackson Park Hospital, and testified that he found Fox in a highly nervous condition and appeared like a man who had been terrorized. He had him take off all his clothing and gave him a very careful physical examination. He found a hematoma, or blood-clot, on the top of his head, with a raised swelling about as high and half as large as a small egg; an abrasion behind the left ear and another on the skull on the same side; bruises on the neck below his left ear and bruises on the right shoulder; a swelling and bruises on the left arm; and bruises, abrasions or little cuts in the skin and anterior aspect of the tibia or shin-bone. There were also abrasions and cuts on the mucous membrane on the inside of his mouth and cuts on the upper lip. "The bruises were discernible, and you could easily see one side was bruised though not much swollen yet cut a good deal more than the other side." There was some swelling on the jaw and some discoloration. Steuben, generally speaking, was in better condition than Fox and did not have the extreme nervousness that Fox had. He had bruises on the anterior aspect of both shin-bones and the same kind of marks Fox had, with cuts and bruises on both shin-bones and deep bruises, with swelling, over the right deltoid muscles that round out the shoulders; and on the right side of the chest, at the edge of the ribs, he found

a long discoloration or deep bruise. He also had a loose tooth—upper incisor. Dr. Omens corroborated Dr. Martusson in these examinations, but states that he was pretty sure that Steuben's tooth was knocked out or extremely loose and that his lip was lacerated under the tooth, on the inside. Steuben asked him to examine the tooth the morning he testified, which he identifies as the one spoken of. These examinations took place on July 10, and they also examined the defendants on the 11th. The wounds were recently made.

Elvert M. Allen, a court reporter, corroborates Fox as to the mussed-up condition of his hair at one of his examinations before Barrett, by testifying that his hair was disheveled and that witness is the one who gave Fox the comb. He also stated, on cross-examination, that he did not see Bernacchi strike Fox, but he was not asked if he was looking or in a position to see it. Barrett, who was the one who told either Bernacchi or Davern to "cut it out," was not even examined by the State on this question, and it is not denied by the witness that Barrett used these words to Bernacchi or Davern.

George T. Dillon, a newspaper reporter for the *Chicago Daily News,* was present at the time of the *habeas corpus* proceeding before Judge Wilson, and testified that Judge Wilson asked Fox to show him where he had been struck, and that Fox exhibited the high, swollen blood-clot on his head and a cut on his lip, which witness saw, and that Fox's attorney, Joseph T. Herrington, pointed out several bruises. Herrington testified in corroboration of Dillon, and stated that he saw the blood-clot on Fox's head; that Fox had a puffed mark on his right cheek and that his lip was puffed like it had been bruised; that the right side of his face was swollen like he might have received a blow, about the corner of his mouth. He also testified that he thought that Judge Wilson was informed by Dr. Mahoney about the condition of Fox, and that the judge suggested to the State's

attorney or his representative that they had better get a physician and have Fox examined. Barrett was present, but he has given no evidence as to Fox's condition or as to other incidents positively testified to by Fox as having taken place in his presence, and neither has any physician testified for the State as to either Fox's or Steuben's condition.

Police officer William Davern testified in rebuttal that he did not at any time strike Fox in the jaw in the presence of Barrett or Samuels; that he was not with Fox on that night and did not strike Steuben at any time; that he did not at any time go into the dark room and does not know what officer was in charge of Fox; that he did not see any marks on Fox's face and did not pay much attention to him.

Five other persons, apparently all police officers, testified for the People. Hugo R. Grate, George S. Horner, Stewart Moss, Thomas J. Mangan and Patrick Knox, none of whom were specifically charged with striking or beating either Fox or Steuben, testified that they did not strike or beat, or see anyone else strike or beat, either of the defendants. Only one of them (Moss) testified that he was in the dark room during the proceedings at the State's attorney's office at the times the defendants testified they were beaten. Knox at one time took Fox into the dark room but was not with him there except for a few minutes, and no one else except he and Fox were in there at that time. Moss was not in the dark room but once, except to take Fox in there, and at that time he and Fox were alone in there for a few minutes. He took him there four other times but did not stop there with him. He does not deny that during the four times he mentions that he took him there three or four other policemen were with Fox, as Fox claims. His denial that he saw no one strike or beat Fox in that room is simply a denial of that which he had no opportunity to see; and that is also the case with the other four officers. Moss and the other four deny striking Fox

or Steuben. They are not charged with it. Moss does state that Bernacchi did not go into the dark room and hit Fox while the witness was there and says that Bernacchi was never in the room, but Bernacchi never did deny being in there, but testified that he was "hanging around this room part of the time" but did not strike or beat Fox or Steuben. All five of these witnesses testify that they saw no bruises or wounds on Fox or Steuben, but some of them say that they did not pay close attention to their appearance. Bernacchi also testified, and denied the charge that he hit, struck or maltreated Fox or Steuben at any time or that he saw anyone else do so. No others of the twenty or twenty-five policemen that were there that night, nor Samuels or any other attorney or assistant State's attorney, testified.

The evidence of the defendants that they were beaten by Davern and Bernacchi in the dark room in the presence of two or three others is not specifically denied by any witness for the State except Bernacchi and Davern. No one denies that there were with the defendants in this room four or more persons at the times they testified they were beaten. The State simply makes a poor attempt at proving that the defendants were not beaten up by some of the police there, and it is clear that the defendants, their two doctors, Herrington and the *Chicago Daily News* reporter have committed deliberate perjury if the defendants did not show physical evidence that they were beaten up by someone. The State has had ample opportunity to disprove these facts by another doctor who was certainly friendly to the prosecution, and has failed to do so or to show that no third doctor examined the defendants.

Both of these confessions were excluded on a former trial before Judge Kersten and there was no verdict on that trial. The trial court in this case should have passed on the admissibility of these confessions and did not do so but submitted this question to the jury, which was error. The

confessions should both have been suppressed and excluded under the evidence in the record, and it was reversible error to refuse to do so. It is true that in passing upon the evidence in this case the interest of the defendants in the result of the suit should be considered, but they are not the only ones who are charged with criminal conduct. The defendants were literally kidnapped by the police and forcibly taken to the State's attorney's office and there held, and were compelled to submit to examinations and to threats, abuses and assaults by the police of the most contemptible character to compel them to confess, if the defendants' evidence is true, without the aid or advice of friendly counsel. No State's attorney has any lawful authority or right to engage in any such proceeding. It is not only a violation of the ethics of his profession, but if such a proceeding is indulged in for the illegal purpose of extorting or forcing a confession from the defendants it is a willful and deliberate violation of his constitutional oath as an attorney at law and as a State's attorney, which he was compelled to take before he could be licensed to practice law or be installed into his office of State's attorney, as well as a violation of the constitutional rights of the defendants. This is also true of every assistant who willfully and knowingly participates in such an unlawful proceeding, and is equally true of every licensed lawyer who participates therein willfully and knowingly, when applied to him as a lawyer. The constitutional oath in this country is still as binding upon the lawyer and public officer as it ever has been, in a legal and constitutional sense, and no officer or attorney should disregard his oath and adopt the theory of the faddists or supposed reformers, who preach that the way to convict criminals is to commit crime in trying them and to disregard utterly the law and the constitution in criminal trials.

The police officers who participated in the beating and maltreating of these prisoners, if they did so, were guilty of the most cowardly assault and battery that it is possible

to commit.   It is the criminal assault and battery upon a helpless and disarmed prisoner whom it was their duty to treat humanely and have promptly committed to jail pending the investigation by a grand jury or coroner's jury or some other legal body, and the defendants had the right to a speedy and legal investigation, and to the advice of legal counsel if indicted by a grand jury for crime.   Every person who knowingly aids, assists, advises or abets such criminal assault is equally guilty with the police who actually committed the same.   The police officers, if guilty, are guilty of a willful and deliberate violation of their oath of office, which includes the constitutional oath, if such assaults were committed to compel confessions.

The court should have passed on the legal evidence before it bearing on these alleged confessions, and in doing so should have considered the interest of all parties who testified on the question and have suppressed the confessions under the evidence submitted.   The People have not made the proper effort to obtain a real and true investigation of the question whether or not the confessions were voluntarily made.   This record shows that such is the case, and the judgment should be reversed and the cause remanded for another trial, with leave to the People to make a further showing on the motion to suppress the confessions, if they shall be so advised.   In view of the evidence in the record, every person connected with the transactions leading up to these confessions ought to welcome a full opportunity to show that the charges of the defendants are not true, if that is the fact.   It has not been done, as shown by the evidence now in the record.

The confession of Steuben before Barrett in the State's attorney's office was not introduced in evidence against Fox, but Barrett, at the conclusion of Steuben's confession there, had both of the defendants taken down on the street to the Winton car, in which Steuben confessed that he and the other parties implicated with him had ridden on the night

of the murder, and there further examined Steuben in the presence of Fox. In this examination Steuben testified that that was the car in which they had ridden, and Barrett had him get into the car and sit in it, and then asked him, in substance, if it did not fit him in the same manner as it did when the shooting took place. Other questions were asked him concerning the car and the incidents of the shooting, and this part of the examination was offered and given in evidence against Fox also, the court holding that while the examination in the State's attorney's room was not competent, the testimony at the car was. This was after Fox had made his confession and while he was under the same influence of fear and impressed with the full belief that the examination was still a judicial examination. No part of this examination was admissible against Fox.