(No. 30676.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HERMAN FREDERICK WEBER, Plaintiff in Error.

*Opinion filed November 9, 1948—Rehearing denied Jan. 12, 1949.*

Fred V. Stiers, and John M. Daugherty, both of Peoria, for plaintiff in error.

George F. Barrett, Attorney General, of Springfield, and Roy P. Hull, State's Attorney, of Peoria, (C. E. McNemar, of Peoria, of counsel,) for the People.

Per Curiam: The defendant, Herman Frederick Weber, was indicted in the circuit court of Peoria County for the murder of Flavel Dean Fueger. He pleaded not guilty. A jury found him guilty and fixed his punishment at death. Motions for a new trial and in arrest of judgment were made and overruled. A justice of this court, in vacation, granted defendant's petition for a writ of error and made the writ of error a *supersedeas*. The record is now before us for review.

The testimony adduced at the trial is largely undisputed. The only important controversy relates to whether Weber, himself, shot and killed Fueger or, instead, was a reluctant

accomplice to the murder of Fueger by a man named John Crowley, whose very existence is questioned. Fueger was twenty years of age, a resident of, and a student at Bradley University in, Peoria. He was last seen alive by a person other than defendant shortly before eight o'clock on the evening of December 3, 1947, as he drove from the university campus toward the center of the city in a brand new 1947 Pontiac sedanette automobile which he had purchased eight days earlier. Fueger had an appointment to meet a young woman at 8:45 P.M. at the side entrance of the Pere Marquette Hotel, where she was attending a party. He was killed, the undisputed evidence shows, about 8:30 P.M. at a lonely spot on a highway about five miles southwest of Peoria. Death resulted from three bullet wounds, the bullets having been fired from a twenty-five caliber automatic pistol, bearing the trade name "Terrible," and serial number 2096. The body, remarkably well preserved, was not found until December 15, 1947, when it was discovered submerged in the shallow water of a drainage ditch near a bridge at Dickson Mounds, about forty miles southwest of Peoria, in Fulton County.

The owner of the gun, Delores Stone, identified defendant as the man who, armed with a knife, had stolen the gun from the glove compartment of her automobile on the afternoon of December 2, 1947. She testified that defendant forced his way into the car as she was unparking in the downtown area of Peoria, ordered her to drive to the airport where he exchanged seats with her, then drove back to the city and, after ascertaining she had no money, took the pistol but did not take the car. Defendant admitted he obtained the gun from the witness on December 2.

At the time of the murder, defendant was twenty-two years of age, married, unemployed, and resided at the home of his wife's parents in Peoria. His mother and stepfather operated a tavern on the outskirts of the city. In July, 1947, defendant was convicted of larceny of a motor

vehicle in the circuit court of Macon County upon a plea of guilty and was admitted to probation. While on probation, he stole a 1946 Chrysler automobile and, subsequently, abandoned it in Iowa. Later, having gone to Decatur to report to a probation officer, he and Fred Wright, a friend who had accompanied him on the trip, stole a grey 1947 Buick convertible automobile in that city and drove it to Peoria.

On December 3, 1947, defendant left his home about seven o'clock in the evening, driving the 1947 Buick convertible so recently stolen. His activities during the next few hours are embodied in five separate written confessions. About nine-thirty in the evening, defendant returned home driving Fueger's 1947 Pontiac sedanette and immediately took his wife for a long drive in the new car. During the next six days, defendant drove Fueger's car openly in and around Peoria. On December 9, the police discovered the car parked in a public street and removed it to a garage for identification. About three o'clock in the afternoon of the same day, defendant found the car was missing and hurried home at once to his wife who told him she had heard a radio announcement that the police had recovered Fueger's car and were testing it for fingerprints. Defendant then sought out his friend, Fred Wright, and told him the police were in possession of the Pontiac. Both Wright and defendant agreed that the latter should leave Peoria and Wright urged him not to delay. Wright loaned defendant a few dollars, borrowed a small sum for him from a mutual friend and drove him to his house to pick up some clothes. Defendant's wife joined him and they then returned to Wright's house where they all had dinner. Wright, a witness for the prosecution, testified that defendant told him privately he had nothing to do with Fueger's disappearance but that the body, if found, would be discovered at Dickson Mounds. Weber denied that he ever told Wright the body would be found at Dickson

Mounds. After dinner, he left in the 1947 Buick convertible, which he and Wright had picked up the previous day from the side street where defendant had parked it on December 3. Defendant told Wright he was going to Conroe, Texas, and that he was first going to stop at his mother's tavern to borrow some money.

Defendant borrowed eighty dollars from his mother and proceeded directly to Texas. He was apprehended in Houston, Texas, about forty miles from the town of Conroe, on December 12, by R. B. Miller, a special agent of the Federal Bureau of Investigation. Miller called another special agent, Leo L. Robertson, to the scene of the arrest and, together, they searched defendant and his automobile. A "Terrible" pistol, serial number 2096, was found in the glove compartment of the car and defendant freely admitted that the extra set of car keys in his possession fitted a Pontiac car belonging to a boy named Fueger. Defendant spent the night of December 12 in the city jail and the following morning he was taken before the United States commissioner in Houston. On the same day, December 13, he wrote out in longhand the first of his several confessions.

City police detective, Fred W. Montgomery, who had found Fueger's car in Peoria, and William J. Lytell, chief deputy sheriff of Peoria County, were assigned to bring defendant back to Peoria. Defendant was delivered into their custody on December 18 and, during an overnight stop at Murphysboro, Illinois, while en route to Peoria, defendant made a second confession, again in his own handwriting. On arriving in Peoria, defendant showed his guards the exact spot where the murder had been committed. Defendant then made three more confessions. On the night of December 20, following a conference with a priest, he executed a third handwritten confession. On December 22, he gave a statement to an investigator for the State Bureau of Criminal Identification and, the following morning, he executed his fifth, and last, confession.

The confessions varied in certain material respects and only the confession of December 23, identified as People's exhibit No. 6, was offered in evidence by the prosecution in its case in chief. Defendant objected to the introduction of the exhibit on the ground that it had been obtained by duress and that it was not a fair and impartial confession. State's Attorney Roy P. Hull, the interrogator, Elsa Parson, the stenographer, and police detective Montgomery, the witness, testified, out of the presence of the jury, that defendant was advised he did not have to make a statement and that it could be used against him; that he was not abused or mistreated; that he was not promised immunity or reward, and that his answers to the questions and his signature on the confession were both voluntary. Defendant testified that, when asked, he agreed to make the statement of December 23, that he made all the answers contained in the confession, and signed it voluntarily. He added, however, that he was willing to make the confession only because he desired to see his wife and mother, but admitted he did not recall anything being said about his wife and mother on December 23. Weber added he was in fair health, but in a broken-down condition, had in mind that he would probably "get off" with a life sentence, was afraid his wife would be arrested if he did not confess and, further, that a man named John Crowley had threatened his wife's life if he were to disclose the identity of the true murderer, namely, Crowley.

Defendant also objected to the confession on the ground that his prior confessions were involuntary. Attacking particularly his statement made in Texas on December 13, defendant related that Miller and Robertson told him his wife had been arrested as an accomplice and was locked up in jail with a number of prostitutes; that he had a yellow streak a mile wide because he would not admit his guilt and tell Fueger's parents where he had hidden the body; that his wife would be released and cleared of all

charges if he made a statement, and that he would receive only a life sentence upon a plea of guilty. Miller and Robertson denied the statements attributed to them by defendant, replying that they merely relayed to defendant information that his wife had been arrested.

The confession of December 23 was thereupon admitted in evidence and the jury was recalled. In response to interrogatories propounded, defendant had stated, in substance, that he left his house about seven o'clock in the evening on December 3 and drove to the "loop" district of Peoria; that, after parking his car, he walked to the corner of Franklin and Jefferson streets and waited for the first 1947 model Buick or Pontiac to come along; that he wanted one of either of these particular makes of automobile so he could sell it to John Crowley, who supposedly lived at 101 Callender Street, in Peoria; that when a 1947 Pontiac stopped for a red light he opened the door and asked the driver for a ride to the municipal airport; that the driver was agreeable, said his name was Flavel Fueger and remarked he had considerable time to spare; that, near a farm for old people, he asked Fueger to stop, told him that he was going to take the car and pulled a loaded pistol from his pocket; that both he and Fueger got out of the car and stood in front of it; that Fueger made a grab at him and he fired twice; that he fired a third time after Fueger fell to the ground; that he then transported Fueger's body in the trunk of the car to Dickson Mounds, where he threw it over the side of the bridge, and that he arrived home about nine-thirty, told his wife he had traded the Buick for the Pontiac and took her for a drive in the new car. Defendant answered that he was alone when he took Fueger's car and admitted making false statements implicating Fred Wright in some of his earlier confessions.

The theory of the defense was that Weber was a victim of circumstances; that one John Crowley had virtually

forced him into Fueger's car; that he was an innocent witness to the murder of Fueger by Crowley; that Crowley told him he would kill his wife if he ever disclosed the truth, and that all confessions, both oral and written, were false and made for the sole purpose of protecting his wife's life. Defendant first sought to have a psychiatrist testify as to his answers to questions following an injection of truth serum but the results of the examination were ruled to be inadmissible.

Special agent Miller was recalled as a witness and, at defendant's insistence, his first confession, dated December 13, was introduced in evidence. In this document, defendant had written that he entered a 1947 Pontiac when it stopped at a red light and forced the driver at gun point to proceed toward East Peoria over the Cedar Street bridge; that, upon reaching the bridge, the driver, in obedience to his command, got out of the car, started walking, hesitated, and made a grab at him; that he fired one shot to frighten the driver but the bullet struck the man in the chest and he fell to the ground, and that he then threw the body into the river, drove home, and told his wife he had traded cars.

Miller's partner, Robertson, related that Weber had made the same confession orally and recalled that, earlier, defendant said he had acquired both the 1947 Pontiac and the gun from a man named Crowley. The substance of this version was that Crowley, who was engaged in the stolen car business, sold defendant the 1947 Buick convertible for $500 with no down payment; that, when a fender of the Buick was smashed, he took back the Buick and gave defendant a 1947 Pontiac, and that when defendant left Peoria, Crowley had no money to lend him, but filled his gasoline tank and gave him the gun.

Police detective Montgomery was also recalled as a witness. He related that, while en route from Texas to Peoria, defendant confessed repeatedly and, later, reduced his oral confession to writing at Murphysboro. The gist

of this confession was that Weber entered Fueger's car and asked to be driven to the vicinity of the airport; that Wright followed in the 1947 Buick convertible; that the two cars stopped in a secluded place and he shot Fueger twice when he resisted; that Wright ran up, told him to shoot Fueger a third time, and that, pursuant to Wright's suggestion, they put the body in the trunk of the Pontiac and drove to Dickson Mounds where they disposed of it in a drainage ditch.

Defendant called Roy P. Hull, the State's Attorney, to state the circumstances surrounding his third confession. Hull related that, on December 20, he told defendant he thought the Murphysboro confession was inaccurate and that he did not believe he had an accomplice. Defendant asserted he would tell the same story before a priest. After talking to a priest called by Hull, defendant wrote out another confession. The witness further related that he read the confession back to defendant in the presence of the priest and pointed out new inconsistencies. Defendant then admitted the confession was false and it was destroyed because it involved other persons who, in the opinion of the witness, had nothing to do with the case.

Weber then took the stand as a witness in his own behalf. With reference to the evening of December 3, he stated that he had an appointment with John Crowley at eight o'clock at the Jumbo Lunch Room and Crowley was a few minutes late; that he first sold Crowley the stolen gun and then they walked to the Pere Marquette Hotel; that Crowley pointed out a 1947 Pontiac double parked near the side entrance of the hotel and told him to ask the driver for a ride; that, as he opened the door, Crowley pushed him into the front seat, jumped into the rear seat, drew his gun and gave Fueger a route to follow; that, later, Crowley ordered Fueger to stop and get out and walk down the road; that he remained in the car while Crowley followed Fueger; that he heard both men arguing,

Fueger calling Crowley "Johnny," and protesting, "I didn't cross you up;" that he next heard two shots followed by a short pause and then a third shot; that Crowley returned to the car and ordered him to help put the body in the trunk and to drive him back to town and that, in Peoria, he parked trunk to trunk with a 1938 Buick coupe, as directed by Crowley, and assisted him in transferring the body to the trunk of the Buick. According to Weber, Crowley told him to take the Pontiac and to forget everything that had happened because if he did not keep his mouth shut he would kill his wife. Defendant said he did not thereafter see Crowley until two days later when he accidentally ran across him on a street corner and that, after repeating the threat to kill his wife, Crowley gave him back the gun and let him keep the money Crowley had paid him for it.

As to his previous connections with Crowley, defendant stated he first met Crowley in October, 1947; that Crowley was engaged in the "stolen car racket" and could provide titles for "hot cars;" that Crowley delivered stolen cars to him and paid him to drive them until "the heat was off;" that he customarily met Crowley two or three mornings a week at or near the Jumbo Lunch Room and Crowley would give him a new car to drive and take back the old one or instruct him to continue to drive the old car; that, prior to December 3, 1947, he had driven five or six cars for Crowley; that, while Crowley was supposed to live at 101 Callender Street, the only time he picked him up at his residence Crowley came out from the side entrance of the house 100 Callender Street; that Crowley had never visited him at his home, and that the only persons who had ever seen him with Crowley were Fred Wright, once, and the waitress and owner of the Jumbo Lunch Room, several times.

Defendant next repudiated all prior confessions of his participation in the crime. With reference to his confes-

sion on December 13, he stated Miller and Robertson told him they had reports that articles of clothing belonging to his wife had been found in Fueger's car; that she had been arrested and locked up with prostitutes, and that she would be convicted as an accomplice if he did not make a confession absolving her. Defendant asserted he confessed to killing Fueger with one bullet and throwing the body in the Illinois River for the purpose of showing his wife was not an accomplice so that she could be released from custody and, also, because he was afraid that Crowley would kill her if he told the truth about Crowley.

As to the confession made at Murphysboro, defendant related that Montgomery told him Fueger's body had been found at Dickson Mounds and it was the police theory that he had an accomplice and that the body had been hidden for several days before it was thrown into the drainage ditch. Accordingly, defendant confessed he had an accomplice, Wright, and they disposed of Fueger's body at Dickson Mounds immediately after the killing. Defendant characterized the confession as untrue and said that he made it only to protect his wife.

Weber next related that, upon his return to Peoria, he continued to implicate Wright because he thought Wright had "squealed on him" and because Wright had lied in telling the police that, on December 9, he confided in Wright that the body would be found at Dickson Mounds. Following a conference with a priest on the night of December 20, defendant wrote his third false confession which was destroyed shortly thereafter when he admitted it was not true. Defendant added that he told the priest he did not kill Fueger but still could not bring himself to tell about Crowley. On further direct examination, defendant testified that he subsequently decided to stop implicating Wright but that, in the course of five or six lie detector tests, no matter which way he answered the question about

Wright's complicity in the crime, the police still told him he was lying.

Lastly, defendant asserted that the confession of December 23 was false for the same reason as all the others,—because he was afraid that, if he told the truth, Crowley would kill his wife, and that if he did not confess he killed Fueger himself his wife would be sent to jail as an accomplice. In addition, he stated that he had not been permitted to see his wife and hoped that if he confessed she would be able to visit him. Defendant acknowledged that his wife had been released from custody prior to the confession of December 23 and, further, that neither the Federal agents nor the local police had mistreated him physically.

On rebuttal, the prosecution introduced in evidence the confession given at Murphysboro and the fourth confession, dated December 22. The confessions of December 22 and December 23 are substantially the same, although the former is much the shorter. The principal evidence in rebuttal, however, was directed to an investigation of the existence of a John Crowley. Eleanor Burby testified that she lived at 101 Callender Street, that no man named Crowley ever resided there, and that she never saw a man of this name about the premises. In like manner, L. E. Robinson stated he had lived at 100 Callender Street for twenty-four years and that no John Crowley ever lived there, nor did he ever see a John Crowley there. Detective Montgomery testified that he interviewed the owner and waitress of the Jumbo Lunch Room and both had stated they did not know anyone named John Crowley and that they did not recall having ever seen a person fitting Weber's description of Crowley.

Defendant's first contention is that the trial judge erred in not granting him a continuance. The indictment was returned on December 30, 1947. A reputable and competent attorney was appointed to represent defendant. On

January 3, 1948, defendant pleaded not guilty. On February 2, 1948, when court convened, defendant's attorney made a motion to continue the cause, advising the trial court of examinations being conducted by two physicians, Dr. Walter Baer and Dr. Erwin Turow, and requesting sufficient time for them to re-examine defendant. The trial judge overruled the motion for continuance but adjourned court early on Monday, February 2, the first day of the trial, upon request of defendant's attorney. The second examination of defendant by the psychiatrists was made between 4:30 and 7:45 P.M. on the day named. Dr. Baer testified that he made two examinations of defendant under truth serum, one the preceding week and one on Monday, February 2. This second examination completed defendant's preparation for trial. The motion for continuance was not renewed nor was additional time for preparation for trial requested. In presenting the motion for a continuance, no reasons were assigned and no proof was offered in its support. From the day the indictment was returned to February 2 when the trial commenced, defendant's attorney had thirty-three days to devote to the preparation of the case. Under the circumstances recounted and in the absence of a showing of sufficient reason for delay, the motion for continuance was properly denied. (*People* v. *Dorr,* 346 Ill. 295; *People* v. *Hauke,* 335 Ill. 217.) The record fails to disclose any unusual circumstances rendering the refusal of additional time either unreasonable or prejudicial. As observed in *People* v. *Moore,* 368 Ill. 455, "It is only where the trial court has abused its discretion in denying a reasonable time for the preparation of the defense, that a court of review will interfere with the trial court's action in denying a motion for a continuance." All the witnesses who testified for defendant were present in court when the motion for continuance was made. The record discloses but relatively little conflict in essential matters between the evidence adduced by the People and

the defendant. Upon the conclusion of the People's case, defendant immediately proceeded with his defense without seeking any further delay, thereby indicating that his counsel was ready and prepared to proceed. For the reason that defendant was neither embarrassed in his defense nor his rights prejudiced by denial of his motion for continuance, the motion was properly overruled. *People* v. *Ritcheson*, 396 Ill. 146.

Defendant contends that his written confession taken on December 23, 1947, People's exhibit No. 6, was involuntary and, consequently, should not have been admitted in evidence. The gist of defendant's contention is that the first statement or confession made in Houston, Texas, was not voluntary and that, therefore, the subsequent confessions made at Murphysboro and Peoria must be presumed to have been made involuntarily until proved otherwise. Defendant insists that he made the earlier confessions, as well as the confession at Peoria, for the purpose of keeping his wife out of jail, because he feared for her life and, further, because of his understanding that, if he admitted perpetrating the crime, he would receive a life sentence, rendering him eligible for parole in twenty years.

At the hearing out of the presence of the jury to determine whether it had been voluntarily made, evidence adduced by the People disclosed that a member of the police department of Peoria and a stenographer were present in the county jail in the morning of December 23, 1947, when the confession was made. According to the officer, defendant was not beaten or mistreated either during the taking of the statement or prior thereto, no promise of immunity was made in his presence, and defendant was advised the statement might be used against him. The State's Attorney, who was present, testified that no threat or promise was made to induce defendant to make the statement and, further, that, so far as he knew, defendant had not been mistreated by anyone since his arrest. Defendant's testi-

mony related largely to the circumstances attending his apprehension in Houston, Texas, eleven days earlier, on December 12. On cross-examination, he stated that after his answers were transcribed he glanced over the confession; that he had ample time to read it; that his handwriting is on the margin of each page and at the end of each sheet, and that "I did that freely and voluntarily. I merely glanced at each page. It took me a couple of seconds to glance at them. I didn't care what was in it. Not at the time. I did sign and swear to it. I was then satisfied with it."

Confessions are competent evidence only when voluntarily made. (*People* v. *Bartz,* 342 Ill. 56; *People* v. *Fox,* 319 Ill. 606.) The question of competency of a confession is for the trial court, alone, to decide. (*People* v. *Ardelean,* 368 Ill. 274; *People* v. *Albers,* 360 Ill. 73.) In determining, as a preliminary question, whether a confession by an accused is admissible, the court is not required to be convinced, beyond a reasonable doubt, of its voluntary character. (*People* v. *Borrelli,* 392 Ill. 481.) Although there may be evidence of promises to induce the making of the confession, yet if there are sufficient facts and circumstances to show that the confession was voluntarily made, there is no abuse of judicial discretion in allowing it to be introduced. (*People* v. *Bartz,* 342 Ill. 56; *People* v. *Costello,* 320 Ill. 79.) A confession is not rendered inadmissible by the mere fact that it was made while in the custody of the police, (*People* v. *McFarland,* 386 Ill. 122,) or by the fact that it was elicited by questions put by police officers, or others. (*People* v. *Fox,* 319 Ill. 606.) The decision of the court on the question whether a confession is voluntary will not be disturbed unless manifestly against the weight of the evidence. (*People* v. *Alberts,* 360 Ill. 73; *People* v. *Bartz,* 342 Ill. 56.

Defendant asserts that the confession itself contains no advice by the State's Attorney regarding his constitutional

rights with respect to making, or not making, a statement. The law does not require a statement of this character to be included in confessions. The constitutional provision that "no person shall be compelled in any criminal case to give evidence against himself" does not include statements and confessions by one suspected of, or charged with, crime when the confession is not made in the course of a judicial proceeding. (*People* v. *Fox,* 319 Ill. 606.) The record affirmatively discloses, however, that defendant was adequately advised of his constitutional rights before making the confession.

Defendant directs attention to the circumstances attending the confession written and signed by him in Texas. This confession, described as People's exhibit No. 10, was offered in evidence by defendant. His later confessions, identified as People's exhibits Nos. 11-A to 11-G, written and signed by him in Murphysboro, together with his confession of December 22, identified as People's exhibit No. 12, were offered and admitted in evidence in behalf of the People in rebuttal, without any objection on defendant's part. The point cannot now be made 'that error was committed in admitting them in evidence. *People* v. *Crowe,* 390 Ill. 294.

In the present case, the record is barren of evidence that the challenged confession was obtained by threats or physical violence. Indeed, defendant testified that no physical force was used to obtain the confession and he does not now contend that either threats or physical violence induced the confession made in Peoria. His own testimony and the testimony of the State's Attorney, a police officer, and the stenographer who were present at the time, is in complete harmony in this regard. A consideration of all the facts and circumstances impels the conclusion that the trial court was warranted in deciding that the confession, People's exhibit No. 6, had been voluntarily made and that, consequently, it was admissible in evidence.

The third contention is that the trial court should have granted defendant's motion to take the case from the jury after the assistant State's Attorney informed the jury of giving him lie detector tests and the alleged results. In his closing argument to the jury, the assistant State's Attorney said, in part, "He, the defendant, admitted on the witness stand that in taking the lie detector test he did not tell the truth when he implicated Wright as helping him in the killing. He stated that during three times when he was taking the lie detector test he was alone in the commission of this murder." No objection was interposed to the remarks now assailed. This being so, their propriety is not open to review. (*People* v. *Holt,* 398 Ill. 606.) Because of the brutality of the offense and the character of punishment meted out to defendant, we are constrained to consider the point made even though not properly preserved for our consideration and despite the fact that it is entirely without merit.

After the assistant State's Attorney had concluded his remarks, a recess was taken and, in the absence of the jury, defendant's attorney made a motion to take the case from the jury upon the ground that prejudicial error had been committed when the assistant State's Attorney made the quoted remarks. Defendant says, "Careful review of evidence regarding alleged lie detector tests reveals that the only evidence introduced at the trial of this cause was in relation to the preliminary investigation of this case, and then only with regard to the supposed guilt of State's witness Fred Wright." Defendant himself testified that he took the lie detector test, saying, "I think they run me through around five or six times. * * * Well I went on the lie detector test first, * * * I didn't want to get Fred Wright involved in something, he was a good friend of mine, but then I was still sore at him for saying that I told him where the body was; then I figured out I didn't want to have him involved in it even though he squealed

on me. I felt pretty bad about having him in it. So, I told them after he put me in the lie detector test, to take his name out of the confession and I would make it over stating I had done everything by myself. Fred Montgomery told me he would let Fred Wright take the lie detector test anyway." Defendant does not challenge the competency of the quoted testimony. Moreover, having testified, as quoted, he is not in a position to attack its competency. (*People* v. *Nipsic*, 385 Ill. 479.) We note that one of defendant's attorneys also commented upon the facts in evidence with respect to the lie detector tests, "Then the State's Attorney used the lie detector test. What was the result? We don't know the result?" and, later, "There is no testimony about a lie detector." Whatever is proved by direct evidence or is fairly inferable from facts and circumstances proved and has a bearing on the issue may be a fair subject for comment by counsel during the closing argument. *People* v. *Shack*, 396 Ill. 285; *People* v. *Gleitsmann*, 384 Ill. 303; *People* v. *Howe*, 375 Ill. 130; *People* v. *Herkless*, 361 Ill. 32.

Defendant's motion to take the case from the jury was properly overruled.

Defendant's fourth contention is that the court erred in giving instruction No. 12: "The Court instructs the Jury that if you believe from the evidence, beyond a reasonable doubt, that the crime of murder was committed, as alleged in the indictment in this case and if you also believe from the evidence, beyond a reasonable doubt, that the defendant, shortly after the commission of the crime with which he stands charged, fled from the State of Illinois and remained away from the scene of the crime until he was taken into custody, such flight is a proper circumstance to be considered in determining the guilt or innocence of such defendant." Defendant contends that there is no evidence showing that he fled from the scene of the crime, as charged in the indictment, or from the State. He says that Wright's

testimony shows, instead, that he departed from Peoria after the murder had been committed because of a reason entirely foreign to the crime charged, namely, because of his admitted implication in the theft of a 1946 Chrysler. Wright testified that defendant told him a warrant had been issued for him in connection with the Chrysler and that he had heard it read; that he loaned defendant what little money he had and borrowed a small sum from a mutual friend for defendant; that defendant said he was going to his mother's place and from there to Conroe, Texas, adding, "He told me that the boy's body, if found, would be found at Dickson Mounds in St. Louis. I asked him if he had anything to do about it, and he said no, he had not," and that, soon afterwards, he left. In his confession taken at Peoria, defendant said, "I went out to Fred Wright's home and told him that the police had picked up the Pontiac and that I had to leave or something;" that he told Wright he needed money "to get out of town * * * I told him the police had picked up Fueger's car. * * * Just before I left I told Fred that I had killed Fueger and that his body was in Dickson Mounds." Defendant learned from his wife that the police had taken the Pontiac automobile "and that they were checking for finger prints." The evidence shows that he immediately decided to leave Peoria; that he packed some clothes and borrowed what money he could, and then drove alone to Conroe, Texas, in a Buick convertible automobile. On December 13, 1947, defendant was arraigned before a United States Commissioner in Houston, Texas, on a fugitive warrant charging him with unlawful flight to avoid prosecution. In the confession, identified as People's exhibit No. 10, defendant states that when he learned the police had located Fueger's car, "I then told my wife that I was going to shove off." The record contains ample evidence that defendant fled from Peoria to Conroe, Texas, for the purpose of escaping arrest for the crimes of robbery

and murder. For the adequate reason that considerable evidence of defendant's flight from Illinois to Texas was adduced, the instruction on flight was properly given. Flight, of course, does not raise a legal presumption of guilt and the jurors were not instructed that it did raise such a presumption. Nor did the instruction direct a verdict. The fact of flight is, however, a circumstance which may be considered by the jury in connection with all the other evidence in the case, as tending to prove guilt. (*People* v. *Gibson*, 385 Ill. 371; *People* v. *Schaffner*, 382 Ill. 266.) Defendant did not request an instruction on his theory of flight and, this being so, he cannot make complaint, upon review, that none was given. *People* v. *Gibson*, 385 Ill. 371; *People* v. *Maertz*, 375 Ill. 478.

Defendant's fifth and final contention is that the evidence does not sustain his conviction. The evidence recounted proved beyond any reasonable doubt that, on December 3, 1947, defendant, armed with a revolver stolen the preceding day, at the intersection of Franklin and Jefferson streets in Peoria, awaited the first person driving a 1947 Pontiac or Buick automobile, with the general intent to steal his car and, if necessary to the consummation of the robbery, to kill the driver. Flavel Fueger happened to be the first person driving one of these cars, a 1947 Pontiac, and, when he stopped at the intersection for a traffic signal, defendant, in some way, by force or otherwise, entered the car and either forced or persuaded Fueger to drive to a secluded spot beyond the city, forced him from the car at the point of a revolver, shot him twice, and after Fueger lay dead on the ground, shot him once again. Defendant then placed the body of the deceased in the trunk of his car and either deposited it in a drainage ditch at Dickson Mounds, in Fulton County, the same night or in another place from which he later transported it to Dickson Mounds.

The evidence narrated shows a premeditated robbery and the murder of Fueger incidental to the perpetration of

the robbery,—a murder ruthless in the extreme. Six days later, upon learning that Fueger's car had been recovered by the police, defendant fled to Texas in a Buick automobile. When apprehended in Houston, Texas, he was carrying in his pocket the keys to the ignition and trunk of Fueger's Pontiac automobile, and the automatic pistol stolen from Delores Stone by him on December 2 and used by him to kill Fueger was found in the glove compartment of the Buick car. These facts were abundantly established by the evidence. According to defendant, for at least a month prior to the homicide, he was participating in a "hot car racket" with one John Crowley. His testimony with respect to Crowley is incredible. Defendant did not produce a single witness who had ever met Crowley and the People's testimony is to the effect that the particular John Crowley exists only in the imagination of defendant. Moreover, defendant, both in signed sworn statements and in many oral statements, declared that he alone robbed and shot Fueger. Admittedly, defendant was in exclusive possession of Fueger's 1947 Pontiac automobile within two hours after he was involved in the murder. His unexplained, exclusive possession of Fueger's car is, in itself, sufficient to prove defendant guilty of the robbery and is evidence in support of the charge of the murder of Fueger, apart from recourse to his confessions or admissions. Where murder is committed during a robbery, all participants in the robbery are deemed equally guilty of murder and it is immaterial who fired the fatal shot. (*People* v. *Pierce,* 387 Ill. 608; *People* v. *Watt,* 380 Ill. 610; *People* v. *Suddeth,* 374 Ill. 132.) If defendant merely sat in Fueger's automobile while the nebulous John Crowley shot and killed Fueger, pursuant to a brutal plan to rob him of his car and, thereafter, helped conceal the body and appropriated the decedent's car to his own use, he would still be guilty of Fueger's murder, without

regard to his own admissions or confessions. *People* v. *Pierce,* 387 Ill. 608 ; *People* v. *Taylor,* 319 Ill. 174.

Defendant received a fair trial, and our examination of the entire record discloses a trial remarkably free from error. He was represented by competent counsel, as the record discloses, and he has been ably represented upon review in this court. His constitutional rights were adequately safeguarded. Evidence of his guilt of the murder of Flavel Fueger is overwhelming and reasonable men and women, as jurors, could have reached no other result than the finding of guilty returned by them. Each of defendant's contentions argued in this court has been carefully considered and decided, even though some were not properly preserved for review.

The judgment of the circuit court of Peoria County is affirmed. It is the judgment of the court that the original sentence of the circuit court of Peoria County shall be executed on the 14th day of January, 1949, and the clerk of this court is directed to enter an order to this effect, and furnish a certified copy of the order to the sheriff of Peoria County at least ten days prior to the date of execution.

*Judgment affirmed.*