(No. 22784.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EMERY ALBERS *et al.* Plaintiffs in Error.

*Opinion filed February 21, 1935—Rehearing denied April 12, 1935.*

CARL H. PREIHS, M. C. COOK, and L. A. CRANSTON, (JOHN W. FRIBLEY, WALLACE KARRAKER, GEORGE W. DOWELL, and PHILIP HILEMAN, of counsel,) for plaintiffs in error.

OTTO KERNER, Attorney General, FORD L. RENDLEMAN and MICHAEL K. GRABOWSKI, State's Attorneys, J. J. NEIGER, and WALTER BUTLER, for the People.

Per CURIAM: Emery Albers, Otis Battaglia, Sam Ferro, Robert Shingleton and Barney Bossetto were indicted in Perry county for the murder of LaVerne Miller, a DuQuoin school girl, on April 6, 1933. A change of venue was granted to Union county and a jury in the circuit court there found them guilty. All received life sentences with the exception of Albers, who received a sentence of forty years, and all now seek reversal by this writ of error. Forty errors have been assigned, but they are so briefed and argued that only seven need be considered in deciding the issues.

The five defendants, excepting Ferro, were miners, residing in DuQuoin. The Progressive Miners of America and the United Mine Workers of America had been engaged in bitter factional strife in Perry county, and this, in turn, had caused the peace officers much concern. In order to combat picketing by the Progressive organization the sheriff had deputized three DuQuoin men, Canada, Weingardt and Miller, who were members of the United miners. Near 9:00 o'clock in the evening of April 6, 1933,

the homes of the three deputies were fired upon by persons riding past in a Chevrolet automobile. Shot-gun slugs entered the Canada home, while bullets from a powerful rifle penetrated the Weingardt and Miller homes. In the latter place LaVerne Miller was seated at a table in the living room doing school work. One of the bullets, after penetrating the house wall, passed through her chest and caused her death.

The trial court allowed to be introduced in evidence only against the defendant making it, two confessions by Albers, one by Shingleton, one by Battaglia and one by Bossetto. Ferro did not make a confessional statement. It is said that the confessions were not voluntary, as they were extorted from the defendants making them by the infliction of physical violence and mental torment. After excusing the jury the court conducted an inquiry into this matter. When Albers appeared before chief of police Pyle, of DuQuoin, and reported his car stolen, Pyle became suspicious, for the description of the car used in the shooting tallied with the description of Albers' car. On the next day, April 7, Albers was questioned by Sergeant Gibbons, of the State highway police, and his aides. The questioning of Albers was started in the city court room, adjourned to the room of police magistrate Sweatt, and from there to a room called the "ladies' jail," which adjoined the magistrate's office. While in the last two rooms Albers made a statement wherein he admitted loaning his car to Battaglia and Shingleton. His statement did not implicate Ferro or Bossetto. Battaglia was taken into custody by the State police and shown Albers' statement. Afterward he made a written statement wherein he admitted driving Albers' automobile during the shooting and charged Ferro and Shingleton with handling the guns, while Bossetto met them immediately after the shooting and relieved them of the weapons. Shingleton, after being taken into custody, was shown the statements of Albers and Battaglia. He made a statement

in which he admitted taking part in the shooting from the Albers' automobile, saying that he used the shot-gun while Ferro fired the rifle. Bossetto, when taken into custody, also made a statement admitting that he knew the shooting foray had been arranged, and that the three met him on the road after it happened and gave him the two guns, wrapped in a blanket, and told him to get rid of them. While in jail in Murphysboro Albers made a second statement one week subsequent to the first one. Each of the four defendants who made statements testified that he was subjected to physical and mental mistreatment before he would sign. Their stories need not be given in detail, but it will suffice if we remark that their stories, if true, would warrant a reversal of this case. To support their point the defendants had Fred Alabastro testify that he was a prisoner in jail on April 7. He said he saw Albers taken upstairs and then heard noises like fighting and "licks" being given and heard Albers' voice. He did not see Albers after this happened. Shingleton was also taken out and Alabastro did not see him return. He also saw Bossetto taken out, and saw him come back with a bump on his forehead and marks under his eye. This witness was a member of the Progressive organization and had been picked up and jailed, with over twenty-five other Progressive miners, on suspicion of being implicated in the killing of the Miller girl. Members of the Alabastro relationship who visited their kin in jail that day testified along the same general line as did Alabastro. Other witnesses who testified for defendants in an endeavor to show that the confessions were extorted were all miners, most of whom belonged to the Progressive organization and had been taken into custody on suspicion of being connected with the shooting. The general gist of this testimony, most of which concerned Shingleton's condition, was, that after he had been taken up-stairs they heard noises coming from there by which they judged a fight was going on. When

Shingleton returned, the right side of his face was said to be red and swollen. A few of these witnesses told of Bossetto having a knot over one eye while the other was black and blue.

To establish that the confessions met all legal requirements the People placed witnesses on the stand, one of whom was Sergeant Gibbons. Defendants sought to impeach his testimony by showing that his reputation, generally, for truthfulness in his home town of Harrisburg was bad.

Sergeant Gibbons testified as to the manner of taking the confessions in substance as follows: In the company of men named Pritchard, Kelley, Bass and Robinson he talked to Albers for the first time on April 7 in the court room on the second floor of the station. The conversation was reduced to writing. At first Albers denied lending his car to anyone, but when told that he would have to go down and see the girl who was shot he offered to write down the whole affair. This Albers did, and no promises were made to him at that time not to use the instrument against him. This instrument (People's Exhibit 5) is in the handwriting of Albers—not just signed by him. Albers was taken before magistrate Sweatt, who asked him if he knew what was in the paper. Albers told him that he ought to know, as he wrote it. The paper was then sworn to by Albers before this magistrate. With reference to the Battaglia confession, Gibbons said it was obtained at the city jail on April 7, Sergeant Grissom and State's attorney Grabowski also being present. The witness was not sure that Major Omar McMackin, of the Illinois National Guard, was present. Battaglia read the statement of Albers and was then advised to go ahead and tell what happened. This he did, and the State's attorney took his statement down. Battaglia swore to it, after signing each page, after he had been told of his constitutional rights by Grabowski. The Shingleton confession, accord-

ing to Gibbons, was obtained on the afternoon of April 7 in the city jail of DuQuoin, with Grissom, Kelley, Pritchard and McMackin also present. This confession was in the handwriting of McMackin but was signed by Shingleton. As related by Gibbons, the Bossetto confession was obtained on the same date and place, with Grissom, Robinson, McMackin· and a stenographer also present. The stenographer took the statement down in shorthand and afterward transcribed her notes. It was testified to that all of the defendants making confessions were first informed of their constitutional rights.

Gibbons underwent a severe cross-examination, and at no time during such examination did he say or admit that he struck either of the defendants, as they have stated. On the contrary, he steadfastly denied that he struck any of them and stated that no others did so in his presence. It is well to remark here that the People placed witnesses on the stand from Harrisburg to show that there was nothing wrong with Gibbons in so far as his reputation as a truthful person was concerned. These last witnesses were impartial, and a comparison of the two lines of testimony only demonstrates that the reputation of Gibbons in the respect challenged was very good.

McMackin stated that he was a major in the National Guard and had been sent to DuQuoin to observe conditions for the Adjutant General of the State. He was in the city hall on April 7 and saw Battaglia on the second floor in that part of the jail used for women. Magistrate Sweatt was in his room adjoining. Gibbons, Kelley, Pritchard and Grissom were in the building, and the State's attorney was in and out of the room during the time the witness was there. Battaglia was questioned, and, as related by McMackin, at first denied participation in the affair of the previous night. After being shown a paper he remarked that if Albers told his story he would tell his, and the State's attorney took his statement. McMackin said that no one

forced Battaglia to make the statement. This same witness saw Shingleton in the afternoon of that day. He at first denied being mixed up in the affair, but when shown Battaglia's statement Shingleton said that he would tell his part. McMackin wrote down what Shingleton told him. He said no violence was offered Shingleton, no threats or promises were made to get the statement or to acknowledge its truth in Sweatt's office. At no time during the day did he see anything unusual about Shingleton's face. It was not red, inflamed or marred in any way. He said there was no scuffling around; that many people were about the station that day, as an inquest was held in the city court room, and that no one beat up or offered to do violence to Battaglia or Shingleton in his presence.

Magistrate Sweatt testified that Albers signed his confession before him, saying, before he signed, that he understood its contents and had written it of his own free will and accord, and then swore that the statement was true. Coercion, force or duress was not used upon Albers in Sweatt's presence and no promise or offer of immunity was held out to him. Sweatt's office is about eighteen feet square and adjoins the women's jail. The witness was in his office all day of April 7 and did not hear anything unusual coming from the women's room. Some hours after seeing Albers' statement he saw Battaglia and his statement. The State police officers and the State's attorney were present. Battaglia told the witness he understood the contents of the instrument and swore they were true. No violence was offered or anything done to Battaglia in the presence of the witness to make him sign the statement. This same witness asked Shingleton if he knew the contents of the paper he was signing. Shingleton replied that he did and swore to it. No one urged Shingleton to sign in the presence of the witness and no one offered to do Shingleton any violence. Part of Shingleton's statement was even written in the presence of this magistrate.

Catherine Knetzger said she took down the Bossetto statement in the presence of several State policemen and the State's attorney. She was seated close to Bossetto and nothing was done to him in her presence. She did not note any bump on his head nor did he mention the subject in her presence.

Robinson, Bass, Pritchard, Grissom and others who came in contact with the defendants during this period testified. The substance of their testimony was that not one of the four defendants making statements were in any manner forced or frightened into making them nor were inducements held out to them. The only defendant struck by the officers was Bossetto, when he attempted to flee when placed under arrest. The officers were required to use force, and the evidence shows that they used only such force as was necessary to subdue him.

It is observed from the testimony given by witnesses for the People upon the voluntary character of the confessions that no assertion of the defendants or their witnesses has gone uncontradicted. The circumstances under which Albers said he made his second statement while in the Murphysboro jail have been contradicted by the testimony of William Ozburn, the jailer, and Mary Ozburn. The jailer said that he did not talk with Albers until several days after he was received. He said Albers appeared worried and wanted to tell a straight story. Some two days later the witness went to Albers, who showed him a memorandum, part of which he read. On April 13 Albers asked Ozburn to call Layman, an attorney. Albers and Layman met in the jail office. A daughter-in-law of the witness, Mary Ozburn, a stenographer, was present. Layman asked Albers if this was his free statement, telling him he would not benefit from it. Albers replied that it was and he knew the result. Albers then took his memorandum and started to read, and the stenographer took it down in shorthand. No violence, force or promises were used to get the story.

Albers signed the statement and the witness also signed it. Ozburn said Albers had been placed in solitary confinement some time after he was received, in the belief that he would talk. The jail was guarded by the regular personnel and one special guard. Miss Ozburn said Albers read from his paper and she took it down in shorthand, sometimes asking Layman how to word something.

Sam Ferro was the only defendant not to make a confession, and it is interesting to observe how his testimony supported that of his fellow-defendants to the effect that they were tortured into confessing. His testimony was implausible and so palpably overdrawn that it must have failed to impress the jury with its truthfulness.

The trial court could not take any middle ground on the admission or rejection of the confessions, for there was none. It either had to believe the witnesses for the defendants or the witnesses for the prosecution. The hearing on the confessions before the court alone covered five days. The question of the competency of the confessions was for the court alone to decide. (*People* v. *Fox,* 319 Ill. 606.) The evidence is contradictory on the question of violence, and this court will not reverse the decision of the lower court in admitting confessions unless its action is clearly against the manifest weight of the evidence. (*People* v. *Guido,* 321 Ill. 397; *People* v. *Reed,* 333 id. 397.) Even though there be evidence that threats or promises were made, if there is sufficient evidence to show that the confessions were voluntary acts the lower court does not abuse its discretion in allowing them to go to the jury. (*People* v. *Costello,* 320 Ill. 79.) The trial court had ample evidence from which to believe the confessions were voluntary. Not one person said that he saw either of the four defendants struck. Not one defendant saw the authorities beat a fellow-defendant. The stories told by witnesses for defendants as to what they heard take place and their opinions as to what was happening to a defendant do not have

strength enough to stand by themselves, for testimonial conjecture is not evidence. The witnesses for defendants were just as likely to be prejudiced in their testimony as the official witnesses for the prosecution—more so, in fact, as some of the witnesses for the People were not connected with local law-enforcement agencies. There is innuendo about a mob, but the defense did not bring forth any direct evidence of its existence. There was much noise, some excitement, and many anxious and curious persons were around the city hall of DuQuoin on April 7, for over twenty-five persons had been arrested in connection with the Miller death. Two other homicides added to the excitement, and one brought about an inquest in the city court room that day. However, the evidence falls far short of establishing the existence of a mob, as that term is generally understood. The trial court committed no error in allowing the confessions to stand as the voluntary acts of their respective authors. The jurors also determined that the confessions were voluntary when they heard practically the same evidence on the question and rejected defendants' stories of duress.

Motions for separate trials were made and denied, and this action of the trial court is assigned as error, based upon the contention that the confession of one defendant should not have been allowed to go in evidence against the others, since each had not adopted the others' confessions. When the motions for severance were made the People countered with a stipulation that it would not offer any confession or statement by any defendant in evidence until there had been eliminated therefrom any statement naming or involving any other defendant and not legally bound thereby. To carry out this stipulation the trial judge took each of the confessions and so deleted and added to each one that the confession when read to the jury did not violate the stipulation. It must be remembered that the jury never saw the original confessions or copies thereof and

that the confessions were only read to the jury after they had been treated by the court. The trial court used exceeding care to keep each confession confined to its maker and those defendants who adopted it. Further safeguard was thrown about defendants by the court giving numerous instructions that protected a defendant who did not adopt or make a particular confession. All of these instructions, eleven in number, were requested by defendants. In this same connection it is said that the defense of Ferro was unduly embarrassed by the statements of Shingleton and Battaglia admitting that they took part in the killing of the girl, while his defense of alibi hinged upon endeavors to show that he, in the company of Shingleton and Battaglia, attended a dance in Pinckneyville. This was the defense also put forth by Shingleton and Battaglia after they had decided to negative their confessions.

The defendants were covered by the same indictment charging all with a common crime. Under such circumstances their motions for separate trials presented no mandatory duty upon the trial court. The law again gives to the trial court the right to determine this question. A court of review will only reverse where it is clearly shown that there has been an abuse of that discretion to the detriment of the particular defendant. (*People* v. *Birger,* 329 Ill. 352; *People* v. *Lopez,* 296 id. 438; *People* v. *Sullivan,* 345 id. 87; *People* v. *Hotchkiss,* 347 id. 217.) Where a motion for a separate trial is made on the ground of confessions of other defendants implicating the defendant making the motion, a severance should be ordered unless the State's attorney agrees that the confessions or admissions will not be offered in evidence on the trial or unless there be eliminated from the confessions any reference to the complaining defendant. (*People* v. *Fisher,* 340 Ill. 216; *People* v. *Blumenfeld,* 351 id. 87.) No abuse of discretion by the trial court is shown in the procedure followed here, and the eliminations and deletions made pur-

suant to stipulation seem to have provided the safeguards required in our former decisions.

Defendants argue that the rules laid down by this court in *People* v. *Sweetin,* 325 Ill. 245, and *People* v. *Rupert,* 316 id. 38, are applicable to the present case. In the *Sweetin case* the principal ground for severance was that the defenses of the two accused were antagonistic. There was no such conflict here. Albers really defended upon the ground of non-participation. He testified that his car was stolen by the killers while he was in a pool-room. Ferro, Shingleton and Battaglia said they were at a dance in Pinckneyville. Bossetto did not testify before the jury, and aside from his confessional statements one can only guess where he was that night. The fact that all defendants were tried together seemingly did not distress their counsel, as they all joined, at times, in representing all the defendants, even going to the extent of examining each other's clients. Each defendant in the *Rupert case* cleared himself and implicated the other. Here the defendants who confessed did not try to throw the blame on the shoulders of the others. The statement of each confessing defendant was used only against its maker unless some other defendant had adopted it in whole or in part. Ferro did not make a confession, and the trial court was very careful to see that the prosecution did not make use of any of the confessions against him, as he had adopted none. The rule laid down in the *Rupert case* is not controlling in this case.

In behalf of the defendants it is urged that the shooting was planned by others and that the actual killer was a man named Attess, who owned a high-power rifle such as the one used to kill the Miller girl. Attess died the morning after the shooting. It was shown beyond all doubt that Ferro, Battaglia and Shingleton were together the evening of the shooting. These defendants claimed, however, that they attended a dance in Pinckneyville that night,

leaving DuQuoin at about 8:00 o'clock. They said they arrived at the dance hall in Pinckneyville around 8:30 that evening and left the place during the intermission, at 10:30. The three then said they started for DuQuoin but ran out of motor fuel, and their car had to be pushed to the city. After obtaining gasoline the trio related that they drove around DuQuoin for a short time and then went to their respective homes. One witness, a relative of Shingleton, told of seeing the three when they arrived at the dance hall. Mabel Thomas, a presumably impartial witness who knew them, testified that she attended the dance in Pinckneyville and saw them arrive at the hall. She stated positively that the three did not arrive until the 10:30 intermission. The person who pushed the Ferro car into DuQuoin said he met them a short time before midnight. He left them and their car at an all-night filling station. The filling station attendant testified that he was on duty alone after 6:00 o'clock in the evening of April 6, and that he closed the station a few minutes after 10:00 o'clock. The identity of the driver of the Albers automobile that night is also the subject of much conflicting evidence. Paul Ferro, speaking in behalf of his brother, said that he told the officers Attess was the driver. These officers testified that Paul Ferro told them the automobile was going so fast he could not recognize the persons in it. This example illustrates only one of the many instances of highly conflicting evidence in this case—so sharply conflicting in many respects that the judgment of the jury in weighing the evidence and determining the credibility of the different witnesses must be accepted as the only reasonable solution. *People* v. *Maciejewski,* 294 Ill. 390.

Shingleton, Battaglia, Albers and Bossetto stand convicted beyond all reasonable doubt by their confessions. Evidence derived by the People from the confessions of Shingleton and Battaglia was not needed to convict Ferro. It was shown beyond all reasonable doubt that Ferro had

aided the Progressive miners in picketing a mine which employed United miners. He was seen attending a meeting of Progressive miners which considered the use of violence. He was seen in the company of the four other defendants a short time before the killing, and he left this gathering place with Battaglia and Shingleton about thirty minutes before the firing took place. After the shooting the three were still together, both in Pinckneyville and DuQuoin. Ferro and Shingleton went to Beaucoup creek to take Battaglia from his fishing the afternoon of April 6. Through the agency of Bossetto the authorities secured possession of the shot-gun and rifle used in the shooting. Tests by a ballistic expert established the fact that this rifle was the one used in killing the Miller girl. Bossetto and Ferro were bachelors, lived together and engaged in liquor sales upon a small scale. The rifle used belonged at one time to a former sergeant of the highway police and was purchased by Bossetto. This rifle was kept in the house occupied by Bossetto and Ferro. Ferro was also seen in a car the night of the shooting with a "long black gun" in his hand. Sufficient illustrations have been given from the highlights of the People's evidence to show that the jury acted reasonably in also finding Ferro guilty. The trial here lasted nearly a month and the record is necessarily voluminous. Taken as a whole, the evidence shows that defendants had conspired to fire into the three houses, and collateral items of proof in sufficient number and character were given to the jury to support the charge of murder.

The court order transferring this case to Union county was made on May 8, 1933—i. e., forty-two days before the start of the June term. It is contended that the judge who in the regular course of events would have held court at that term did not issue a special order calling a jury, hence there was no legally impaneled jury to try the case. The concluding language of paragraph 128 (Smith's Stat. 1933, chap. 37, p. 938,) provides, however, that as to Union

county "no grand or petit jury shall be summoned to attend the said June term except by special order of the judge holding said court." On June 26 the judge holding that court ordered the drawing of 100 petit jurors in the same manner as a regular panel is drawn. The only objection coming out of this challenge to the array shows that a venire was drawn from a list of 741 names, which was about ten per cent of the legal voters at the time of the primary election in April, 1932, but was less than ten per cent of the 9227 legal voters at the time of the general election in November, 1932. This, however, constituted a substantial compliance with statutory requirements, which, coupled with a full compliance thereof in every other respect, is all that the law demands to negative such an objection. The defendants have failed to point out where the substantial compliance with the statute has resulted in any harm to them. They have not charged that the venire contained persons who did not meet the legal requirements of jurors. Statutory requirements made for the guidance of officers and designed to secure system and dispatch are not usually regarded as mandatory unless the rights of parties are shown to be injuriously affected. *People* v. *Lieber*, 357 Ill. 423.

Defendants charge that their cause was seriously damaged in the giving and refusing of certain instructions. They tendered 89 instructions, 35 of which were accepted and given by the court. Of the 39 People's instructions tendered, 33 were accepted. No good purpose could be served by the extended discussion necessary to set forth these many objections in detail. We have carefully considered every objection tendered and are unable to find any error in the giving or refusing to give instructions which would warrant reversal of the judgment. The instructions, considered as a series, fully and fairly instructed the jury on the law. How the confessions should be received and considered by the jury, how they should re-

88

ceive and weigh the testimony of witnesses, the manner of arriving at the verdict, and the form thereof, were all given careful consideration. In the giving of instructions the court did not curtail defendants in the presentation of the law applicable to their theory of defense. Other alleged errors having to do with argument made by counsel for the State and the admission or rejection of certain testimony have also been carefully considered, but no error has been pointed out which would warrant a reversal.

The judgment of the circuit court of Union county is therefore affirmed.

*Judgment affirmed.*