(No. 31141

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRED VARELA *et al.,* Plaintiffs in Error.

*Opinion filed January 18, 1950—Rehearing denied March 13, 1950.*

FRANK A. McDONNELL, (DWIGHT HIGHTOWER, ANDREW W. BRAINERD, and RUSSELL BAKER, of counsel,) all of Chicago, for plaintiffs in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, PETER G. KUH, RUDOLPH L. JANEGA, EDMUND H. GRANT, and JOHN M. LONG, all of Chicago, of counsel,) for the People.

Per CURIAM: Plaintiffs in error, Fred Varela and Alphonso Najera, otherwise called Alphonso Alvarez, were jointly indicted in the criminal court of Cook County for the murder of Albert Brody. They entered a plea of not guilty and Varela entered a motion for a severance, which motion was overruled. Upon trial they were both found guilty of murder by a jury and sentenced to death. Motions for a new trial and in arrest of judgment were made and overruled, and judgment and sentence of death entered on the verdict.

Error is urged in four particulars: (1) The reception of the defendants' confessions violated the due-process clause of the Federal and State constitutions in that the evidence discloses the confessions were not voluntary. (2) Statements allegedly made by the defendants which implicated them in other crimes were improperly admitted in

238

evidence. (3) Refusal of the court to grant a severance. (4) The court gave improper instructions for the People.

The evidence discloses that on the morning of April 12, 1948, around 6:00 A.M., the body of Albert Brody, a taxicab driver, was found lying between the sidewalk and the street, near 114th Street, in the city of Chicago, adjacent to Trumbull Park. Five empty cartridges of a type used in an automatic pistol were found near his body. He had been shot in the head four times and once in the left hand. Later his cab was found by the police, unoccupied, on Houston Avenue, between Ninety-fifth and Ninety-sixth Streets. It was examined for fingerprints, one being found on the door of the cab and one on the rear-view mirror. above the front seat. Brody's wallet was found empty, sticking out of a pocket in his jacket. A "Longines" wristwatch, made of yellow gold, with a yellow gold band of fine mesh, was missing from the body. The fingerprints found on the door and rear-view mirror were compared with those of various persons by the Police Bureau of Identification and the one taken from the rear-view mirror was found to correspond with the print of the defendant Najera. Investigation revealed that Najera had left Chicago with the defendant Varela, and a Federal warrant was obtained for the arrest of Najera under the Federal Flight Statute. (U.S.C., Title 18, chap. 49, sec. 1073.) Officers of the Federal Bureau of Investigation located Najera and Varela at the home of Najera's relatives in Sequin, Texas, where both were taken into custody on April 29, 1948. They were taken to San Antonio, Texas, where Najera was arraigned before a United States Commissioner and remanded to the county jail on default of bond. Varela was turned over to the San Antonio police. On May 4, 1948, the defendants were indicted for murder in the criminal court of Cook County and proceedings were completed to extradite them from Texas. On May 14, officers John P. Kelly and Raymond Lamb of the police

department of Chicago, departed for San Antonio carrying extradition warrants for the defendants. They arrived in San Antonio on May 15. On May 19 they took custody of the defendants and departed for Chicago about noon. They arrived in Chicago on May 20, around 11:30 P.M. During the time the defendants were confined in Texas they were questioned by F.B.I. agents, but made no admissions of guilt, Najera stating that on the night of the murder he was drunk and had no memory of what he did. During the time the defendants were in jail in San Antonio they were visited by various relatives, including Varela's mother. There is no claim that they suffered any mistreatment in Texas. On the arrival of the officers from Chicago, they also questioned defendants, but obtained no admissions of guilt. The defendants were brought from Texas by the officers, handcuffed and with leg irons. The party traveled in a compartment where they were provided with meals and the defendants occupied beds during the night. The officers sat up. There is no claim that the defendants were mistreated on the train or questioned, although the handcuffs and leg irons were left on them during the entire trip. The train arrived in Chicago about 11:30 P.M. and the party was met by other officers and the defendants were taken to the Bureau of Identification where their pictures were taken and other data recorded. They were taken next to the Ninth District police station, arriving there around 1:30 A.M. on the morning of May 21. They were then separated and questioned intermittently. During this period defendants repeatedly stated they did not want to make a statement and wanted to see their people, a lawyer or someone. About 4:00 A.M., Najera, being confronted with the fingerprint and other evidence of his guilt, admitted that he killed Brody and that he had given the gun to his brother, Benito. He was then taken to a telephone where he called Benito and talked to him, after which he stated that Benito did not have the gun any longer. The next

morning defendants were taken to the State's Attorney's office in the Criminal Courts Building, arriving there around 9:30 A.M., where they were questioned by the Assistant State's Attorney. During the morning Varela's parents, accompanied by a woman, were permitted to see him. After that, around 11:30 A.M., a reporter was called in and took down questions and answers to and by Varela, in which he admitted he was with Najera when the crime was committed. Thereafter, around 1:40 P.M., Najera made a confession which was taken down by a reporter. He stated that on the night of April 11, 1948, he and Varela went to a dance at Our Lady of Guadalupe Church at Ninety-first and Brandon in Chicago; that they left there after about an hour and a half and went to the Balboa tavern at Eleventh and Halsted, where Varela's father worked as a muscian; that they arrived at the tavern about midnight and stayed there for some time; that they left intending to take a streetcar home, but as they walked away they decided to take a taxicab; that they hailed a cab and told the driver to take them to 1013 South Blue Island, where Najera's mother-in-law lived; that as they approached that point, they drew guns and asked the driver, "You know what this is?" They then put the driver in the back seat with Varela, and Najera drove the cab down Roosevelt Road to the outer drive and south on it to South Chicago; that Varela told him to find a dark spot and he drove over various streets to a place alongside what appeared to be a park, where he stopped the cab on the wrong side of the street, facing south; that they then all got out on the left side of the cab and Varela said he might as well not be identified because he had 17 years to do and said his gun would not go off; that Najera then took the gun, a .32 automatic, cocked it and shot the driver four or five times; that he and Valera then got back into the cab and drove it to Houston street, where they got out and wiped the cab to remove fingerprints and abandoned it; that after

they left the cab Varela told him he had taken the cab driver's wristwatch; that thereafter they decided to go to Texas and left Chicago on the morning of April 13, taking Irene Castillo with them as far as East St. Louis, where she left them and he and Varela continued on to Texas; that Varela had the wristwatch with him on the trip and, some days after they arrived in San Antonio, they were in a tavern and Varela ran out of money; that some girls were with them in the tavern, one of whom was named Lily, who was a cousin of Varela's; that Varela pawned the wristwatch with the tavern keeper for $10; that about two weeks later they were arrested in Sequin at the home of some of his relatives.

The confession was transcribed and, in the presence of both defendants, was read aloud. Najera made various corrections in the transcript and initialed them and then signed the written confession. Varela, who was present, was asked to sign it and refused, saying his mother told him they had hired a lawyer and for him not to sign any statements. He was asked if what had been read aloud and what Najera had signed was true and he said it was true.

Much controversy is raised as to whether defendants were taken before a magistrate for arraignment on May 21, as contended by the People and shown by the record. The record discloses that on May 21, Fred Varela and Alphonso Najera were brought before the court and the cause was continued until May 24. On May 22 counsel for defendants entered their appearance, the defendants being arraigned on Monday, May 24, 1948.

On the trial, defendants claimed the confessions were inadmissible and, on preliminary hearing out of the presence of the jury, defendants testified that they were beaten by the police, left in shackles during the whole period of questioning and were denied food and water until after they had confessed. They did not identify anyone as hav-

ing beaten them and no evidence was offered showing any marks or bruises on their bodies at the time as a result of such beating. Police officers testified they were not beaten and that food and water was available to them. Najera denied any recollection of signing a confession but admitted the signature and corrections were his. Varela denied ever having joined in the confession. The court, after hearing all of this evidence, overruled the motion to exclude the confessions and admitted them into evidence.

On the trial before the jury, Varela did not testify, but Najera repeated his testimony that the confessions were coerced and police witnesses denied this testimony.

Before the jury, Irene Castillo testified that she had accompanied defendants from Chicago to East St. Louis on April 13; that she stayed all night with Varela in a hotel room there, and that he told her to go back to Chicago because he and his friend were on the run.

Lily Molina, a cousin of Varela's, testified she was in a tavern in San Antonio with defendants during April, 1948; that Varela asked her to arrange for him to pawn a wristwatch; that the watch was square, yellow gold and had a fine gold mesh band; that she arranged the pawn with Inez Mendez, who operated the tavern.

Inez Mendez testified she loaned Varela $10 on such a watch on that occasion. Neither of them knew the trade name of the watch pawned. Inez Mendez testified Varela's mother redeemed the watch from her. Varela's mother admitted redeeming the watch, but stated the watch she redeemed was a "Bulova."

Defendants' evidence in defense of the charge consisted chiefly of testimony of various witnesses tending to establish an alibi. Since the defendants do not controvert the finding of the jury on the evidence, it is unnecessary to detail such testimony. The People introduced evidence that Najera, while confined in the Cook County jail on Septem-

ber 18, 1948, participated with two other persons in a jail break. He was rearrested and returned the following day.

The first and principal contention of defendants is that the admission into evidence of their confessions constitutes reversible error. On objection to admission of the confessions into evidence by defendants, a preliminary hearing was held out of the presence of the jury, on the question of their voluntary character. The question of fact was presented as to whether or not physical violence was used. The evidence in that respect being in conflict, it presented a question of fact as to whether the confessions were voluntary. The only evidence of physical mistreatment is in the testimony of defendants themselves, there being no evidence of marks or scars or any evidence of abuse, and no identification of any individual officer as having inflicted any blows upon them. All such testimony was denied by the officers.

We have held that where the trial court heard evidence on the question as to whether a confession was obtained through force and violence, and there is no proof of the use of force except defendant's own testimony, the evidence of officers and others present being that no threats or promises were made or violence used, it is not error to admit evidence of the confession. (*People* v. *Tuttle,* 382 Ill. 147.) In deciding the question of admissibility, the court need not be convinced beyond a reasonable doubt of the voluntary character of the confession. (*People* v. *Costello,* 320 Ill. 79.) The decision of the trial court will not be disturbed unless it is manifestly against the weight of the evidence. *People* v. *Weber,* 401 Ill. 584; *People* v. *Nixon,* 371 Ill. 318.

Defendants recognize this rule and do not contend that the finding below on the question of the use of force and violence is against the weight of the evidence, but they insist that the uncontroverted evidence below establishes

that the conditions under which the confessions were taken were so inherently coercive as to constitute a denial of due process of law and thus make the confessions inadmissible.

No efforts were made as to confessions until they arrived in Chicago. They admit they were well treated until they were taken to the Ninth District police station about 1:30 A.M. on the morning of May 21, 1948, after they arrived in Chicago. It is clear that from around that time until about 5:00 A.M. they were questioned by police officers. After that period defendants were placed in cells until about 9:30 A.M., when they were taken to the office of the State's Attorney and questioned, where Najera confessed around 1:40 P.M. Varela's parents were in contact with him during this period and it is clearly established the defendants were taken before the criminal court of Cook County during the afternoon where their arraignment was continued to enable Najera to obtain counsel. At about 4:00 P.M. thereafter, Najera signed the transcript of his confession and made and initialed certain corrections. The confession having been read aloud in Varela's presence, he stated that it was true but refused to sign it on the ground his mother had told him they had a lawyer and not to sign any statements. The defendants were then turned over to the sheriff of Cook County and confined in the Cook County jail.

Defendants assert they were detained without arraignment, without counsel for twenty-two days, kept in shackles during the last forty to fifty hours and subjected to intermittent and intensive questioning by relays of officers and that this constitutes a denial of due process of law under the Federal and State constitutions. The record here does not disclose there was any such questioning or abuse and, in any event, the confessions were made within a few hours after inquiry was made, and signed after there was contact with their friends and they had been before the court.

It is evident that no such circumstances or conditions were present in this case as contended by defendants. There was some conflict as to how long defendants remained shackled, police officers testifying the shackles were taken off after their arrival at the Ninth District police station.

Defendants rely chiefly on three Federal cases discussed below. In *Watts* v. *State of Indiana,* 338 U. S. 49, 69 S. Ct. 1347, the defendant was held for six days, the first two being spent in a cell called "the hole" in solitary confinement, without any place to rest except the floor. During the period he was subjected to long periods of questioning by relays of officers. After six days of this he confessed. The court there held the requirements of due process had been violated and that the confession was inadmissible.

In *Turner* v. *Commonwealth of Pennsylvania,* 338 U. S. 62, 69 S. Ct. 1352, the defendant had been confined for five days without permitting access to friends or family, during which practically continuous questioning was carried on by relays of officers, without advice as to his constitutional rights or of his right to remain silent and without arraignment. There, too, the confession was held inadmissible for violation of due process.

In *Harris* v. *State of South Carolina,* 338 U. S. 68, 69 S. Ct. 1354, the defendant, an illiterate negro, was held for over five days, without access to friends or family and without advice as to his rights, was threatened with the arrest of his mother and was questioned intermittently for three successive days, once for twelve continuous hours and without arraignment. It was held the confession thus obtained was inadmissible as violating due process.

Defendants contend these cases are squarely in point and require reversal of the instant case. A careful examination of these decisions reveals the contrary. No such circumstances of coercion are presented in the instant case. This court has expressed its condemnation of confessions obtained by methods of coercion as being violative of the

Illinois constitution, (Constitution of 1870, art. II, sec. 10,) and recognized the application of the due-process clause of the fourteenth amendment of the Federal constitution to confessions obtained in State cases. *People* v. *Thomlison,* 400 Ill. 555; *People* v. *Crabb,* 372 Ill. 347; *People* v. *Vinci,* 295 Ill. 419.

In the instant case it is apparent first, that until defendants' arrival at the Ninth District police station at 1:30 A.M. on May 21, the situation surrounding the defendants was almost completely devoid of any of the elements present in the cases they rely upon here. Although they had been incarcerated some 21 days in Texas and en route, it is clearly apparent that such detention contained no elements of abuse and was necessary to permit the completion of the processes of indictment, extradition and return. Access to them was not denied their family and friends and the absence of counsel was not because access to them was denied. Their detention during this period had no bearing on the validity of their confessions. Therefore, if any binding analogy exists between the cases cited and this case it must be found in the events between 1:30 A.M. and the making of the confessions, all of which occurred within a period of not more than 16 hours on May 21, 1948. It is obvious the period involved is not comparable to those in the cited cases. The defendants here were not held incommunicado, for it appears that Varela's parents were with him during the morning and before he joined in Najera's confession. There is evidence that Najero talked to his brother over the telephone at about 4:00 A.M. The defendants were subjected to only two sessions of questioning separated by about four and one-half or five hours respite. They were mature men, Najera 26 and Varela 25, and knew the charges against them. There is no contention that they were under any disability. They were taken before the court for arraignment within the 16-hour period after their arrival in its jurisdiction

and arraignment was continued to allow them to be represented by counsel. Under these circumstances and facts, we are of the opinion they do not reveal such inherent coerciveness as existed in the cases cited by defendants, or that, as a matter of law, the confessions were involuntary.

Other cases relied on by defendants are likewise so factually different as to be indecisive here. After an examination of the many cases cited in the briefs on this question, we are of the opinion the evidence here on the question of admissibility does not disclose a situation so inherently coercive as to constitute a denial of due process of law, and there was evidence on which the court below could reasonably find that the confessions were voluntarily made.

Defendants contend that prejudicial error was committed in the admission of their statements to certain witnesses, which they claim implicated them in other crimes. One of the statements complained of was that made to Irene Castillo in East St. Louis by Varela, when he told her he and his friend were "on the run." Another statement complained of appears in the testimony of one of the officers, where he testified that Najera had told him that Varela had told Irene Castillo that he had "killed a man in Chicago, not a cab driver, a man." The officer was obviously attempting to make it clear that Najera did not specify the occupation of the cab driver as the man killed. We do not think the jury was misled by this testimony. To discuss the cases cited, which are in no way in point, would unnecessarily burden this opinion.

It is next contended by defendants that it was prejudicial error to refuse Varela's motion for a separate trial. An examination of that motion reveals that two grounds were advanced for severance, (1) That Najera had broken jail and had caused great public clamor and much publicity as a "confessed" murderer, whereby it would be impossible for Varela to obtain a fair trial if tried jointly with

Najera. (2) Najera had made a confession implicating Varela, the implications of which could not be separated from Varela on a joint trial.

It is apparent from the record and fully conceded that the defenses of the two defendants are not antagonistic. It was shown to the court at the time the motion for severance was made that Varela had adopted Najera's confession as being true in all respects. Defendants rely on *People* v. *Barbaro,* 395 Ill. 264, but there the defenses were antagonistic. It was urged that Najera had confessed implicating Varela. It clearly appears from the evidence that Varela joined in the confession. In such a situation the joint confessions were admissible against both defendants. (*People* v. *Nixon,* 371 Ill. 318; *People* v. *Lehne,* 359 Ill. 631.) The case of *People* v. *Fisher,* 340 Ill. 216, is closely in point on this question. The other contention that a severance was necessary because evidence incompetent as to one or the other of defendants was admitted is without merit since, when requested, the court instructed the jury to limit its consideration of such evidence. (*People* v. *Mutter,* 378 Ill. 216; *Gillespie* v. *People,* 176 Ill. 238.) A motion for a severance is within the sound discretion of the court. (*People* v. *Berry,* 399 Ill. 17.) See, also, *People* v. *Siegal,* 362 Ill. 389, as to prejudice. No prejudice is shown in the instant case.

Defendants complain of two instructions given by the People on the question of weight to be given confessions. A careful reading of the two instructions, as given, reveals that the construction placed upon them by defendants rests entirely on their separate consideration and without regard to all the elements included therein. It is well settled that instructions are to be taken as a series and not individually when considering their effect. (*People* v. *Marsh,* 403 Ill. 81.) Taken as a series, the instructions fully and fairly announce the law applicable to the theories of the People and of the defendants, respectively, and do not constitute

prejudicial error. This also applies to the one refused instruction of which the defendants complain.

We have thoroughly examined the entire record in this case and have given careful consideration to every objection urged, as the importance of the case demands, and can find no prejudicial error in the record, and do not find that the defendants did not receive that fair and impartial trial to which they are entitled.

The judgment of the criminal court of Cook County is, therefore, affirmed. It is the judgment of the court that the original sentence of the criminal court of Cook County be executed on the 17th day of March, 1950, and the clerk of this court is directed to enter an order to this effect and furnish a certified copy of the order to the sheriff of Cook County at least 10 days prior to the date of execution.    *Judgment affirmed.*