(Nos. 32168, 32188.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEROY LINDSAY *et al.*, Plaintiffs in Error.

*Opinion filed June 4, 1952—Rehearing denied September 10, 1952.*

474

FRANCIS T. MCCURRIE, and JOHN M. BRANION, both of Chicago, for plaintiffs in error LeRoy Lindsay and Earlie Burton; JOHN D. VOSNOS, HAROLD OMAR MULKS, and GEORGE A. BOSOMBURG, all of Chicago, for plaintiff in error Emanuel Scott.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, WILLIAM J. McGAH, JR., and JOHN M. LONG, all of Chicago, of counsel,) for the People.

Per CURIAM: Plaintiffs in error, LeRoy Lindsay, Earlie Burton and Emanuel Scott, together with one James Pickett and Emil Washington, were jointly indicted for the murder of William Murphy, a police officer of the city of Chicago. Emil Washington died before trial. Lindsay, Burton, Scott and Pickett were jointly tried at the April, 1951, term of the criminal court of Cook County, were found guilty, and Lindsay, Burton and Scott were each sentenced to death in the electric chair and Pickett was sentenced to fourteen years' imprisonment. The three first named come here from the criminal court of Cook County on writ of error to review the verdict of the jury finding the defendants guilty of murder and fixing their punishment at death, and the judgment and sentence to death by electrocution, and also to review the overruling of the petition to expunge the judgment and sentence filed on behalf of defendant

Emanuel Scott. The cases have been consolidated for hearing by this court.

The composite factual picture presented at the trial was the result of direct evidence from eyewitnesses as well as admissions contained in confessions made by each defendant separately. The record discloses very minor conflicts in the testimony adduced on behalf of the State and defense with reference to the events that led up to the homicide in question.

Shortly before midnight on April 24, 1950, a bartender and two customers were in a tavern and liquor store at 455 West Fifty-ninth Street in Chicago. A man walked in, ordered some beer and immediately walked out. Shortly thereafter, this man returned with three others and announced that it was "a stickup." All four men were armed. Two of them took the bartender and the two customers to the rear of the tavern while the man who had originally come in alone went behind the bar to the cash register and the fourth stood at the door of the tavern. The man behind the bar had trouble with the cash register and the bartender was called back to open it. The men demanded a bottle of Scotch and as the bartender was reaching up to get it William Murphy, a policeman in uniform, walked in on the scene. As Murphy reached for his gun, the man at the door grabbed him, the man behind the bar started shooting and jumped over the bar towards the policeman. The man at the door also fired. One of the men at the back ran towards the front, shooting. All four men ran out. Murphy lay on the floor dead.

The four men were later identified by the bartender as Lindsay, Burton, Scott and Washington. Washington was the man who first came in alone and was the one who rifled the cash register. Scott was identified as being the man at the front door, and Lindsay and Burton as the men who took the bartender and the customers to the rear, and Lindsay as the one who moved to the front when the firing

started. One of the patrons said he did not see the faces of any of the bandits, while the other patron saw the faces of only two of the four and positively identified Lindsay and Burton.

There were a total of eight bullet wounds in Murphy's body and any one of six of them would have been sufficient to have caused death.

Three bullets were removed from the body of the officer, three fell from underneath his undershirt when it was removed from his body and five spent bullets were recovered from the immediate vicinity, all of which were introduced in evidence. The police recovered three pistols from the Jackson Park Lagoon after a conversation with the defendant Lindsay shortly after his arrest. Ballistic tests indicated that of the three bullets recovered from the deceased's body, one was fired from a .38 caliber gun and the two others were fired from a Spanish model gun which Lindsay said in his statement he held.

In addition to the foregoing direct evidence, the People introduced six statements made by the various defendants, after a preliminary hearing as to their voluntary character had been conducted by the court outside of the presence of the jury. The first statement in point of time was made at 6:45 A.M. on April 26, 1950, by Lindsay alone. This statement was a factual recital which implicated Scott, Emil Washington, James Pickett and another fellow known as "Ted," as well as Lindsay. The second statement in point of time was given by Lindsay at 9:30 A.M. on April 26, 1950, on the Sixty-third Street Bridge over the Jackson Park Lagoon, while none of the other defendants were present. This statement pertained to the disposition of guns in the lagoon by Lindsay and implicated another fellow by the name of "Ted." The court before admitting these first two statements instructed the jurors not to regard any statements, facts or other matters related therein as against the defendants Pickett, Scott and Burton.

The next statement in point of time was given jointly by Pickett, Scott and Lindsay at 12:50 P.M. on April 26, 1950. The defendant Burton was not present. The court instructed the jurors before admitting this statement in evidence to disregard any facts contained therein that involved defendant Burton. The statement was a further factual recital of the events of the night of the homicide implicating by name all of the defendants herein. The next statement was that of Washington taken in the hospital at 3:20 P.M. on April 26, 1950, the defendants Scott, Pickett and Lindsay being present. The defendants also participated in answering questions at that time. The court, before admitting this statement in evidence, instructed the jurors to disregard any reference to the defendant Burton. The fifth statement in point of time was a joint statement of Burton, Pickett, Scott and Lindsay, taken at 12:40 A.M. April 27, 1950. None of the first five statements were signed. The last statement was that of Washington taken at 12:00 noon, April 27, 1950, at the Bridewell Hospital, with Burton, Pickett, Scott and Lindsay present and participating in the questioning and answers. This last statement was signed by Burton, Pickett, Scott, Lindsay and Washington.

All of these statements are in substance identical. In each of them it is admitted that the five men got together in an automobile earlier in the evening and secured guns from Pickett's house. After having visited several other places and having ridden around for awhile, Pickett had an argument with Washington and left the group before they went to the tavern where the homicide occurred. Washington entered the tavern first and came out saying that there were only two customers inside and that the others should come in. All were armed. Lindsay and Burton took the customers and the bartender to the rear. Scott stood at the door while Washington went behind the bar to the cash register. Thereafter a policeman walked in

and Washington leaped over the bar and grappled with him. Shots were fired and thereafter the four men fled from the tavern. Washington and Scott, both wounded in the scuffle, were dropped off at Washington's house. Lindsay and Burton drove to Jackson Park where three guns were thrown into the lagoon.

Scott took the stand in his own defense and admitted being at the scene of the shooting, armed at the time, and in the company of the other men for some time before the shooting. However, his testimony was to the effect that he did not know there was a holdup planned, that his companions were taking him to a party in Morgan Park. Scott contends that he was given a gun and, when they arrived at the store where the homicide occurred, he was told that he had to participate in the robbery as a lookout guard at the entrance of the store. Shortly after Scott took the stand and started his testimony, a motion was made on behalf of the other defendants that either a mistrial be declared or that they be severed from the case because of surprise and testimony adverse to the interests of the other defendants. These motions were denied, but the court did instruct the defendant Scott and his counsel not to mention the names of the other defendants, which instruction was thereafter strictly obeyed.

Lindsay also testified in his own defense and admitted the truth of his original confession or admission. He admitted taking part in the armed robbery and admitted firing a shot in the tavern. However, he denied that the shot was fired at the policeman and said he shot at one of the other men because he was angry at the other man. He also admitted throwing the guns in the lagoon. Burton's defense consisted solely of the testimony of one character witness who was unable to give much aid to the cause, since he was not acquainted with Burton's general reputation in his neighborhood.

Prior to the trial, motions for severance and separate trial were made by Lindsay, Burton and Scott, each on the ground that the other defendants had made admissions and confessions which would be used on the trial against the parties making the confessions and that therefore a fair and impartial trial could not be had. Scott's motion also was based on the proposition that the defenses of the various defendants would be antagonistic and inconsistent with each other. Upon the State's Attorney stating that no statement would be used that had not been made jointly or adopted by them, the motion was denied.

Motions for a new trial and in arrest of judgment as to each of the defendants were denied and, on May 18, 1951, sentences were entered as hereinbefore indicated.

On August 23, 1951, counsel for the defendant Scott filed a petition to expunge the judgment and sentence as to Scott because the criminal court of Cook County which tried the case had no power or authority to do so for the following primary reasons: (a) Because the presiding judge had never been assigned to the criminal court jointly by the judges of the circuit court of Cook County and of the superior court, as required by the constitution of the State of Illinois, said judges having no lawful authority to delegate such power of assignment to an executive committee. (b) Because the presiding judge had not taken an oath of office as judge of the criminal court of Cook County, as required by both the United States and Illinois constitutions.

From certified copies incorporated in the record, it appears that the circuit court of Cook County has adopted certain rules of the court which provide for an executive committee and also that judges who are to sit in the criminal court of Cook County shall be designated from time to time by the executive committee. Such executive committee on January 26, 1951, assigned the presiding judge who heard this case to the criminal court of Cook County

as of February 5, 1951. The judge assigned to the criminal court was a duly elected and qualified judge of the circuit court of Cook County at the time, who had taken the prescribed oath for circuit judges.

The assignment of the errors relied upon for reversal is in substance as follows: (a) That the trial court erred in refusing to grant separate trials, both before trial and during trial; (b) that the six confessions admitted in evidence were not shown to have been voluntarily made; (c) that the court erred in requiring defendants to submit to a hearing on the admissibility of the confessions outside of the presence of the jury before any of said confessions had been offered in evidence; (d) that the court erred in refusing to compel the prosecution to allow the defendants an opportunity to examine the confessions before the preliminary hearing on their admissibility and again before any evidence on them was adduced on the trial; (e) that the defendant Burton was prejudiced when the first four confessions made outside his presence were read to the jury without having deleted the name "Ted" therefrom; (f) that the court erred in failing to give written instructions to the jury as to the confessions made outside the presence of the respective defendants; (g) that prejudicial argument of the prosecutor deprived the defendants of a fair trial; (h) that Scott was not proved guilty beyond a reasonable doubt; (i) that the admission in evidence of the six confessions and their being read in evidence consecutively produced a cumulative prejudicial effect upon the jury which deprives the defendants of a fair trial; (j) that the trial court erred in denying Scott's petition to expunge judgment and sentence.

The general rule is that persons jointly indicted shall be jointly tried. Except in those cases where fairness to one or more defendants requires that a severance be granted, the matter lies in the discretion of the trial judge and the question of abuse of such discretion depends upon the facts

of each case. It is incumbent upon a defendant, moving for a separate trial, to show how he would be prejudiced by a joint trial. If he fails so to do, he cannot on review complain of the acts of the trial court in denying his motion. Where defenses are antagonistic and one defendant accuses the other, thus making it impossible for the defendant asking for a severance to have a fair trial, the severance should be granted. However, a motion for a severance must set out the grounds showing the reason for granting the severance. The trial court passes upon the motion on the grounds advanced at the time it is made. Any set of circumstances sufficient to deprive a defendant of a fair trial if tried jointly with another is sufficient to require a separate trial. The granting of a severance and separate trial is within the sound discretion of the court but it is a judicial and not an arbitrary discretion. *People* v. *Fisher,* 340 Ill. 216; *People* v. *Albers,* 360 Ill. 73; *People* v. *Minnecci,* 362 Ill. 541; *People* v. *Meisenhelter,* 381 Ill. 378; *People* v. *Tabet,* 402 Ill. 93; *People* v. *Varela,* 405 Ill. 236.

Each of the defendants' motions for severance and separate trial in this case alleged first that the other defendant had made statements, admissions and confessions that would be used on the trial against both the persons making them and the petitioner, that if compelled to stand a joint trial the petitioner would not be able to secure a fair and impartial hearing, and that the defenses of the codefendants were antagonistic and against the petitioner for those reasons. Nothing further was pointed out in said petitions for severance wherein the petitioning defendant could not receive a fair hearing on a joint trial. Ordinarily, confessions or admissions of a codefendant are not competent as against the defendant not making them, but are competent when properly restricted as against the defendant making the confession or admission; and where a motion for separate trial is made on the ground of confessions of others implicating the defendant making the motion, a severance should

be ordered unless the State's Attorney declares that the confessions or admissions will not be offered in evidence on the trial or unless there be eliminated from the confessions any reference to the complaining defendant. (*People* v. *Fisher,* 340 Ill. 216.) In this case, confessions were made by codefendants outside the presence of and implicating the petitioning defendant. However, the additional element is present in the instant case that each of the defendants moving for a separate trial had admitted substantially the same set of facts and circumstances surrounding the commission of the crime for which they were jointly indicted. At the hearing on the petitions for severance the State's Attorney announced that no statements would be used against any of the moving parties which had not been made jointly or adopted by them. Also, on the trial, the court instructed the jury upon the admission of each confession or admission that it should be considered and applied only to the defendant or defendants who had made it and that the jury should not consider it against any of the other defendants. The motions for severance in no place show or point out in what manner the defenses of the various defendants were antagonistic to each other, and, in each of the statements made, the defendant was not attempting to exonerate himself but in effect implicated both himself and all others in the crime, each statement in substance agreeing with the statements made by each of the other defendants. The factual situation in this respect is almost identical to the case of *People* v. *Fisher,* 340 Ill. 216. The trial court did not abuse its discretion in refusing the defendants' respective motions for severance and separate trial.

The trial court at considerable length heard evidence touching upon the issue as to whether the foregoing confessions were voluntarily made. The defendants, and they alone, testified that force and violence were used to obtain from them their statements confessing their guilt. Countervailing testimony came from the officer and others present

at the time the admissions were made. It is important to note that not a single defendant corroborated another on the charge that there were force and intimidation used. In deciding the question of admissibility the court need not be convinced beyond a reasonable doubt of the voluntary character of the confession. (*People* v. *Costello,* 320 Ill. 79.) The decision of the trial court will not be disturbed unless it is manifestly against the weight of the evidence. (*People* v. *Varela,* 405 Ill. 236; *People* v. *Weber,* 401 Ill. 584; *People* v. *Nixon,* 371 Ill. 318.) From a careful examination of the record it is readily apparent that there was ample evidence to sustain the trial court's decision that the statements had been made voluntarily.

Although this extensive inquisition took place at the behest of defendants, their counsel then made an attack upon the regularity of this hearing, stating that it was premature and improper, that the defendants should not be required to submit to such a hearing before such confession had been offered in evidence. Inasmuch as the hearing was held outside the presence of the jury, on motion of defense counsel after one of the purported statements had been identified as an exhibit, the defendants are estopped from claiming error on the ruling of the court in denying the defense motion to halt such proceeding after the People's evidence had been fully presented and the defense had commenced with their testimony. None of such proceedings having been before the jury, and the matter having been fully and exhaustively heard, no prejudice was done any of the defendants.

Error is further assigned on the court's refusal to compel the prosecutor to permit defense attorneys to inspect the confessions and admissions at the time of the preliminary hearing on their voluntary nature, prior to their having been offered in evidence. This contention is without merit. As held in *People* v. *Fisher,* 340 Ill. 216, the defendants cannot require the State to produce for inspec-

tion the confessions or admissions during a preliminary hearing to determine their voluntary nature, as they are not material to the question to be determined.

Although the first four statements were made outside the presence of the defendant Burton, the defendant Burton later made a joint statement which was admitted in evidence almost identical in substance with the first four confessions. Also, the court, upon admitting the first four confessions in evidence, instructed the jury to disregard them as to the defendant Burton. These facts considered in the light of the *Fisher case* forces this court to the conclusion that the defendant Burton was not prejudiced by the admission of the first four confessions in evidence without deleting the name "Ted" therefrom.

It is also contended that the jury should have been instructed in writing to disregard the confessions made outside the presence of the respective defendants. The abstract does not disclose that any such instruction or instructions were requested to be given by the court. If an accused wishes certain instructions to be given, he should offer them and request the court to give them, since the trial court is under no duty to give instructions on its own motion. *People* v. *Weisberg,* 396 Ill. 412.

The defendants Lindsay and Burton further contend that prejudicial argument of the prosecutor deprived them of a fair trial. Only portions of the argument of the prosecutor were abstracted. Much of this seems to have been directed against Pickett who is not a party to this review. The balance of the argument complained of consists of a strong plea for the death penalty, interspersed with references to a Supreme Being and to the Scripture. It is impracticable to formulate precise rules as to what is proper argument to a jury, as each case must generally be determined upon its own facts. While it is improper for the prosecutor to make statements the only effect of which is to inflame the passions or develop the prejudices of the

jury without throwing any light upon the issues, he nevertheless has a right to denounce a defendant as guilty of the crime charged if the evidence fairly tends to prove his guilt, and to draw inferences unfavorable to defendant if based on the evidence. (*People* v. *Reed,* 333 Ill. 397; *People* ·v. *Anderson,* 403 Ill. 128.) A State's Attorney may dwell upon the evil results of crime and urge a fearless administration of the criminal law. Remarks here complained of were within the bounds of propriety and the proper scope of argument and were not so prejudicial to defendant as to require a new trial. Without merit, also, is the contention of Scott that he was unduly prejudiced by the cumulative force and effect of reading to the jury separately all six of the confessions.

The remaining issue as to whether or not the criminal court of Cook County which tried the case had authority and power to do so, as presented by Scott's petition to expunge the judgment and sentence, remains to be answered. Section 26 of article VI of the Illinois constitution of 1870 establishes the criminal court of Cook County, and, among other provisions, are the following: "The terms of said criminal court of Cook county shall be held by one or more of the judges of the circuit or superior court of Cook county, as nearly as may be in alternation, as may be determined by said judges, or provided by law. Said judges shall be *ex officio* judges of said court."

As previously noted, the presiding judge of the criminal court of Cook County which heard this case was assigned to the criminal court by the executive committee of the circuit court of Cook County pursuant to rules previously adopted by the judges of said circuit court. Defendant Scott contends that, under the constitution, such delegation of authority to an executive committee is unlawful and unconstitutional and that a proper assignment can be made only by the joint action of the judges of the circuit and superior courts of Cook County. The rules of

the circuit court, which have been of many years standing, provide for the practical and effective administration of the business of the court and are within the power of the court. Such rules must, of course, be consistent with the law. The executive committee established by the rules has supervision of the work of the court and it is the committee's duty to see to the due administration of its business. The rules are the rules of the court and are binding on each of the judges. The criminal court of Cook County is an independent court entirely distinct from the superior court of Chicago and the circuit court of Cook County. Its judges are required to be selected from the judges of the circuit or superior court as nearly as might be in alternation by the choice of the whole number of judges of the respective courts or as might be provided by law. Since no other method has been provided by law, the rule, which expresses the determination of the judges, fixes the method of appointment. (*People ex rel. Chicago Bar Ass'n* v. *Feinberg*, 348 Ill. 549.) An assignment of a judge from the circuit court of Cook County to the criminal court of Cook County, pursuant to rules of court duly adopted by the judges of said court, is constitutional and proper, until otherwise provided by law. Once a judge of the circuit court is properly assigned to the criminal court of Cook County, he automatically and *ex officio* becomes a judge of said criminal court by virtue of the constitutional provision. Before an individual can be assigned as a criminal court judge he must be a duly qualified judge of the circuit court. This necessarily implies that he must have previously taken and subscribed such oaths as may be prescribed by both the Illinois and Federal laws. Such a judge, even though assigned to duty as a judge of the criminal court, continues to be bound as a judge by his original oath of office. The State's statutes and the Illinois constitution each prescribe the oath that shall be taken and subscribed by the several judges of the circuit courts of this State and of the superior

court of Cook County prior to their entering upon the duties of their offices. No other oath is required for such a judge to act *ex officio* in the criminal court of Cook County, once he has been duly and regularly assigned thereto. The action of the trial court in denying the defendant Scott's motion to expunge the judgment and sentence was correct.

The purpose of reviewing a judgment of conviction in a criminal case is to determine whether or not the defendants have had a fair trial under the law, whether their conviction is based on evidence which properly established in the minds of the jury beyond a reasonable doubt the guilt of the accused, and whether errors, if any are found in the record, could reasonably have affected the result reached by the jury. If the law is shown to have been fully met, it is the duty of this court to affirm the judgment. (*People* v. *Anderson,* 239 Ill. 168; *People* v. *Fisher,* 340 Ill. 216.) We have thoroughly examined the entire record in this case and have given careful consideration to every objection urged, as the importance of the case demands, and we can find no prejudicial error in the record and do not find that the defendants did not receive that fair and impartial trial to which they are entitled. Notwithstanding the seriousness of the consequences to these defendants, we are unable, after the close scrutiny of the entire record demanded by the gravity of the case, to escape the conviction that the defendants have received a fair trial, free from error of a reversible character. The evidence clearly demonstrates, beyond a reasonable doubt, the guilt of these defendants. On the night in question, all three of these men embarked upon a felonious enterprise to commit robbery. They were each armed with loaded revolvers. The compelling inference follows that they intended to use their deadly weapons to kill if necessary in the event they encountered opposition. The authorities are uniform in making all participants in the robbery equally guilty regardless of whether they fired

the fatal bullets that destroyed Murphy's life. A jury is the sole judge of the turpitude of the crime and it is its responsibility to fix the punishment within the limits imposed by law. Unless it clearly appears that the jury has abused its power, it is not the province of a reviewing court to disturb its determination. The robbery and killing in this case were planned and perpetrated in a cold-blooded fashion in utter disregard of law and life.

The judgments and sentences of the criminal court of Cook County are therefore affirmed, and said sentences shall be executed on the seventeenth day of October, 1952. The clerk of this court is directed to enter an order to that effect and furnish a certified copy of such order to the sheriff of Cook County at least ten days prior to the date of execution.

*Judgments affirmed.*

ON REHEARING: The death of defendant Earlie Burton, on June 12, 1952, having been reported to the court, this cause is abated as to said defendant.

As to the remaining defendants the rehearing is denied.